**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 29, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RONALD KEITH IRVING,

Defendant-Appellant.

No. 10-7012

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:09-CR-00036-RAW-1)**

James Alexander Drummond of Jim Drummond Law Firm, PLC, Norman,
Oklahoma, for Defendant-Appellant.

Ryan Roberts, Assistant United States Attorney (Mark F. Green, United States
Attorney; Linda A. Epperley, Assistant United States Attorney, with him on the
brief), Office of the United States Attorney, Eastern District of Oklahoma, for
Plaintiff-Appellee.

Before **MURPHY**, **HARTZ**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

Following a jury trial, Defendant-Appellant Ronald Keith Irving was

convicted of one count of witness tampering, in violation of 18 U.S.C.

§§ 1512(a)(1)(A) and 2, for his part in a murder-for-hire scheme directed at killing a local law enforcement officer prior to that officer testifying against Mr. Irving.[1]  He also was convicted of one count of possession of crack cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii). Mr. Irving was sentenced to 360 months in prison, followed by eight years of supervised release.  Mr. Irving now appeals his conviction, raising five claims: (1) the indictment failed to charge a crime; (2) the indictment was duplicitous; (3) there was insufficient evidence introduced at trial to support his convictions; (4) the district court abused its discretion in excluding the testimony of a defense witness who was present in the courtroom in violation of the Rule of Sequestration; and (5) the district court abused its discretion in admitting testimony from the target of the murder-for-hire scheme regarding his role in an earlier investigation and prosecution of Mr. Irving.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Mr. Irving's convictions.

---

[1]     Mr. Irving was tried alongside codefendant Deandre Laron Washington, who was also convicted of one count of witness tampering, in violation of 18 U.S.C. §§ 1512(a)(1)(A) and 2.  Mr. Washington appealed, raising several challenges identical or similar to those raised by Mr. Irving in this appeal. We rejected Mr. Washington's challenges and affirmed his conviction.  *See* *United States v. Washington*, 653 F.3d 1251, 1254 (10th Cir. 2011).

## BACKGROUND[2]

Mr. Irving's charges relate to his association with Lt. Brian Stark. At all material times, Lt. Stark was head of the Special Investigations Unit ("SIU") of the Muskogee Police Department ("MPD").[3] The SIU primarily handled narcotics investigations, and Lt. Stark was its "hands-on" supervisor. R., Vol. II, at 238 (Trial Tr., dated July 20–23, 2009). Under his leadership, the SIU "dramatic[ally] increase[d]" the number of search warrants that it obtained and arrests that it completed. *Id.* at 239–40. The media developed an increased interest in the SIU's activities and Lt. Stark handled all media matters for the SIU, becoming "the face of the unit for the public." *Id.* at 240–41.

On August 25, 2008, Lt. Stark was part of a five-person team conducting surveillance of a controlled buy of narcotics from Mr. Irving. Officer Casey Hix of the MPD set up the controlled drug buy, using a confidential informant named Terrence Banks. Mr. Banks had two telephone conversations with Mr. Irving in establishing the arrangements for the buy. Mr. Banks used an MPD-provided cell

---

[2]    "We recount the facts in the light most favorable to the government." *United States v. Pursley*, 577 F.3d 1204, 1210 n.2 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1098 (2010). We previously set forth facts pertaining to the murder-for-hire scheme in our opinion resolving the appeal of Mr. Irving's codefendant, Mr. Washington. *See Washington*, 653 F.3d at 1254–57. We repeat that statement of facts here only to the extent necessary to provide a foundation for our resolution of Mr. Irving's appeal and include additional facts relevant to Mr. Irving's appeal.

[3]    This is the police department for the City of Muskogee, Oklahoma.

3

phone and the MPD recorded the calls. In both calls, Mr. Irving spoke in cryptic terms and appeared reluctant to discuss the details of the upcoming drug transaction.[4]

The MPD used standard controlled-buy procedures on August 25, 2008. Specifically, prior to the purchase, the MPD searched both Mr. Banks and the police-owned vehicle that he drove to the drug transaction. No drugs, money, or contraband were found during this search. Mr. Banks was given $300 to make the buy and equipped with an audio-visual recording device.

Mr. Banks and Mr. Irving met, per their arrangement, in a Blockbuster store parking lot. Mr. Irving, who had arrived before Mr. Banks, approached the latter's vehicle with a balled-up left hand. He stuck this hand inside the window of Mr. Banks's vehicle. Mr. Banks reported that Mr. Irving dropped a sack of crack cocaine and grabbed the money that was lying on his lap.[5] Immediately

---

[4] For example, in the first conversation, Mr. Irving would not confirm a location for the drug transaction—thus, depriving the MPD of an opportunity to set up surveillance—and Mr. Irving noted that "[t]he phones be funny," R., Vol. II, at 170 (internal quotation marks omitted), which Mr. Banks took as a sign that Mr. Irving "didn't want to say too much over the phone, give out too much information." *Id.* Moreover, in the second conversation, Mr. Irving evaded Mr. Bank's inquiry about the kind of car that he would be occupying when he arrived at the site of the drug transaction, and stated that "I don't talk on that phone when I'm doing that." *Id.* at 907.

[5] The entire meeting was photographed and videotaped; however, the actual exchange (i.e., the exchange of drugs for money) occurred "below . . . the line of the window" and thus was out of view of any MPD camera. R., Vol. II, at 177.

4

thereafter, Mr. Banks departed the Blockbuster parking lot and drove directly to a rendezvous point with local authorities. At no point during the entire controlled buy did Mr. Banks ever exit his vehicle, nor did anyone approach it or enter it except for Mr. Irving.

Upon reuniting with the police, Mr. Banks provided Officer Hix with the narcotics—10.48 grams of crack cocaine.[6] At that time, Mr. Banks and the vehicle were searched for a second time, revealing no other drugs or money. Mr. Banks then gave a voluntary statement to the police declaring that the purchased drugs came from Mr. Irving.

As a result of this controlled buy, Mr. Irving was arrested in mid-February 2009 as part of a large narcotics round-up. On February 24, 2009, a Criminal Complaint was filed against Mr. Irving in the United States District Court for the Eastern District of Oklahoma. Accompanying the Criminal Complaint was a sworn affidavit by Lt. Stark, detailing the circumstances of the controlled buy of August 25, 2008.

Shortly after Mr. Irving's arrest, local authorities received a handwritten note from a prisoner at the Muskogee County Jail indicating that someone was trying to have Lt. Stark killed. The prisoner who sent the note, Durrell Collins,

---

[6]     The MPD initially estimated that the narcotics weighed 11.5 grams. Officer Hix later submitted the narcotics to the Oklahoma State Bureau of Investigation for chemical analysis, and lab tests determined that the net weight of the cocaine base was 10.48 grams.

was interviewed, at which time he told the authorities that he had been contacted by Mr. Irving about potentially arranging a "hit" on Lt. Stark. R., Vol. II, at 290–92. According to Mr. Collins, Mr. Irving first hatched this murder-for-hire plot in 2006, when he told a group of people at a party that he would pay $50,000 to anyone who would kill Lt. Stark. The impetus behind Mr. Irving's desire to eliminate Lt. Stark in 2006 apparently was Lt. Stark's involvement in a prior drug-related investigation and prosecution of Mr. Irving, which was based on a 2005 controlled buy of crack cocaine in which Mr. Irving took part. Another government witness, Nathan Simmons, also testified at trial that Mr. Irving had announced at a 2006 house party in Eufala, Oklahoma, that he was willing to pay between $25,000 and $50,000 to have a cop (presumably Lt. Stark) killed. At that time, Mr. Collins, who was present at the party, told Mr. Irving that he knew someone—i.e., Deandre Washington, whose nickname was "Monster"—who might be willing to do the "hit." *Id*. at 290, 293–94. Nothing immediately materialized following their 2006 conversation. However, while they were both in jail in February 2009, Mr. Irving sent a note to Mr. Collins suggesting that they move forward with the plan.

Mr. Collins then spoke directly to Mr. Irving regarding the plan through cell phones that had been smuggled into the jail. The cell phones were in the possession of Milton Warrior and Sean Warrior, cousin inmates who also were housed in the Muskogee County Jail. Sean Warrior was Mr. Irving's cell mate,

6

and Milton Warrior was housed near Mr. Collins. As a follow-up regarding Mr. Irving's note, Milton Warrior called Sean Warrior on his cell phone and got Ronald Irving on the phone, and then Milton Warrior asked Mr. Collins to come into his jail cell so that "[Mr. Collins could] talk[] to Ron Irving." *Id.* at 298. According to Mr. Collins, Mr. Irving asked him if he was "still cool on—you know what I'm talking about on Stark[]?" *Id.* When Mr. Collins responded that he was on board, Mr. Irving "asked [him] what [he] needed to do to bond out [of jail]." *Id.* at 298–99.[7] As Mr. Collins later explained, Mr. Irving wanted to "get [him] out [of jail] quicker to get the job done." *Id.* at 299. Then, as noted above, Mr. Collins contacted law enforcement through a handwritten note.

At the behest of federal investigators, Mr. Collins pretended to go along with Mr. Irving's plan. Mr. Collins discussed his bond with Mr. Irving and Mr. Irving assured him that he would arrange for someone to bring Mr. Collins's girlfriend the bond money to get him out of jail. And he did so.[8]

---

[7] At trial, Milton Warrior—who was called as a witness by the government—testified to overhearing Mr. Collins's side of the conversation, and confirmed what Mr. Collins said.

[8] First, Mr. Irving's brother, Anthony Irving, contacted a bonding company on Mr. Collins's behalf and obtained a lower bond amount. Then, Mr. Collins provided information to his girlfriend that he apparently received from Mr. Irving regarding where to pick up the money and the date and the time for the pick up. Mr. Collins's girlfriend followed the plan and a man unknown to her gave her money that she used shortly thereafter to bond Mr. Collins out of jail.

7

Once out, Mr. Collins contacted Mr. Washington, who agreed to do the hit. The two ultimately agreed to travel down to Muskogee on March 11, 2009. The plan was for Mr. Washington to shoot Lt. Stark to death in Muskogee on that same day. At no point during Mr. Collins's interactions with Mr. Washington did he identify Mr. Irving as the person purchasing Mr. Washington's services. Mr. Washington did know that payment for the killing would be made in two installments (as instructed by Mr. Irving): $25,000 up front, with another $25,000 following the successful completion of the hit.

During this time, Mr. Collins also remained in contact with Mr. Irving via a contraband cell phone that was smuggled into the jail for Mr. Irving.[9] On March 5, 2009, Mr. Collins called Mr. Irving to inform him that "[m]e [sic] and [Mr. Washington] are on our way down there [i.e., Muskogee]." *Id.* at 322. At that time, Mr. Collins further confirmed that half of the payment would be made up front. The next day, the two spoke again, and Mr. Irving encouraged Mr. Collins to move forward with the plan, saying: "Shit, come on!" Aplee. Add. of Exs., Ex. 34 (Audio Recording of Mar. 6, 2009, Call). When the two spoke again on March 8, 2009, Mr. Collins told Mr. Irving that "[m]e [sic] and [Mr. Washington] [will] be down there tomorrow" to "take care of that." In response, Mr. Irving

---

[9] Upon his release, Mr. Collins was provided with a cell phone by the Federal Bureau of Investigation ("FBI"), which allowed the FBI to monitor and record Mr. Collins's calls. Recordings of Mr. Irving's conversations with Mr. Collins were played for the jury during trial.

requested that Mr. Collins "[h]oller at [him]," (i.e., contact him later), and concluded by saying "[i]t's on my nig." Aplee. Add. of Exs., Ex. 35 (Audio Recording of Mar. 8, 2009, Call). The two spoke again on March 11, the day of the planned killing. After speaking with Mr. Irving, Mr. Collins understood that he needed to get the gun for the hit on Lt. Stark and he ostensibly planned to pick one up in Muskogee on March 11.

Mr. Washington was arrested in transit to Muskogee on March 11, 2009. He was subsequently indicted, along with Mr. Irving, on one count of tampering with a witness, in violation of 18 U.S.C. §§ 1512(a)(1)(A) and 2.[10] Specifically, the indictment charged that the two men "did attempt to kill Lieutenant Br[i]an Stark by conspiring to shoot him with the intent to prevent the attendance or testimony of Lieutenant Br[i]an Stark in federal court proceedings against [Mr. Irving]." R., Vol. I, at 24–25 (Indictment, filed Mar. 18, 2009). The indictment also charged Mr. Irving with one count of possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii).

---

[10] 18 U.S.C. § 1512(a)(1) provides, in pertinent part:

> "Whoever kills or *attempts to kill* another person, with intent to—
>
> > (A) prevent the attendance or testimony of any person in an official proceeding;
> >
> > . . .
>
> shall be punished as provided for in paragraph (3)."

18 U.S.C. § 1512(a)(1)(A) (emphasis added).

9

Mr. Irving and Mr. Washington were tried together. At trial, the government introduced evidence—the substance of which is largely described above—relying primarily on the testimony of Lt. Stark, Mr. Collins, and Milton Warrior. Following the close of the government's case, Mr. Irving moved for a judgment of acquittal, arguing only that "[t]here has not been sufficient evidence to submit this to the jury." R., Vol. II, at 655. The district court, however, denied the motion. The defendants then proceeded to put on several witnesses, including: Sean Warrior, who testified regarding the conversations between Mr. Irving and Mr. Collins, and provided reputation and opinion testimony regarding Milton Warrior; Mr. Washington, who testified that he had never intended to kill Lt. Stark and was only playing along to get the up-front money; and Anthony Evans, the Assistant District Attorney for Tulsa County, who testified to the fact that Mr. Collins was cooperating with the police in return for a new charge and an application to revoke being dropped.

Finally, Mr. Irving testified on his own behalf. Regarding the drug-trafficking charge, he claimed that he was set up during the controlled buy, alleging that the money he took from Mr. Banks was repayment for an earlier loan he had made to Mr. Banks when Mr. Banks had first been released from jail. Mr. Irving acknowledged conversing on the telephone with Mr. Banks about meeting him at the Blockbuster parking lot, but denied that he was trying to be evasive or to avoid talking about details of an upcoming drug transaction. Regarding the

10

witness-tampering charge, Mr. Irving disclaimed any motive to kill Lt. Stark, asserting that Lt. Stark was only on surveillance during the controlled buy and thus his death would not have benefitted his court case. Lastly, Mr. Irving claimed that the voice on the recorded calls, that the police alleged were between him and Mr. Collins, was not his—that he had given the contraband phone to another inmate—and that he had been set up in the murder-for-hire plot.

Following the summary denial of Mr. Irving's renewed Rule 29 motion at the close of evidence, the case was submitted to the jury. The jury returned a guilty verdict against both defendants on all counts, and the district court then sentenced Mr. Irving to two 360-month sentences, to be served concurrently. This timely appeal followed.

## DISCUSSION

As noted, Mr. Irving raises five challenges to his conviction on appeal: (1) the indictment failed to charge a crime; (2) the indictment was duplicitous; (3) there was insufficient evidence introduced at trial to support his convictions; (4) the district court abused its discretion in excluding the testimony of a defense witness who was present in the courtroom during trial in violation of the Rule of Sequestration; and (5) the district court abused its discretion in admitting Lt. Stark's testimony regarding his role in an earlier investigation and prosecution of Mr. Irving on drug-related charges. Each claim is addressed in turn.

11

## I.    Whether the Indictment Sufficiently Charges a Crime

Mr. Irving first argues that the indictment was defective.  More specifically, he contends that the interplay between "attempt" and "conspiring" in the indictment resulted in the government's failure to charge a cognizable federal offense.  We rejected an identical challenge in Mr. Washington's appeal.[11]  *See Washington*, 653 F.3d at 1257–61.  Although the law of the case doctrine is not a limit on our power, *see, e.g.*, *United States v. Monsisvais*, 946 F.2d 114, 116 (10th Cir. 1991), nor "an inexorable command," *United States v. Alvarez*, 142 F.3d 1243, 1247 (10th Cir. 1998) (quoting *White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967) (internal quotation marks omitted), and is subject to very limited exceptions, *see, e.g.*, *Alvarez*, 142 F.3d at 1247,[12] we conclude that the doctrine

-------

[11]    Indeed, Mr. Irving states that he "relies strongly on, and appropriates verbatim to a significant extent, Mr. Washington's argument made in his Appeal." Aplt. Opening Br. at 13.

[12]    In *Alvarez*, we described the exceptions and their scope as follows:

> [W]e will depart from the law of the case doctrine in three exceptionally narrow circumstances:
>
> (1) when the evidence in a subsequent trial is substantially different;
>
> (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or
>
> (3) when the decision was clearly erroneous and would work a manifest injustice.

(continued...)

applies to our rejection of Mr. Washington's indictment challenge, *see United States v. LaHue*, 261 F.3d 993, 1010–11 (10th Cir. 2001) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. Furthermore, when a rule of law has been decided adversely to one or more codefendants, the law of the case doctrine precludes all other codefendants from relitigating the legal issue" (citation omitted) (quoting *Alvarez*, 142 F.3d at 1247; *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)) (internal quotation marks omitted)); *see also United States v. Wardell*, 591 F.3d 1279, 1306 n.16 (10th Cir. 2009) ("Our analysis and rulings in [Mr. Wardell's codefendant's case] apply with full force to Mr. Wardell's arguments and are law of the case"), *cert. denied, --- S. Ct. ----,* 2011 WL 4770782 (Oct. 11, 2011); *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1258–59 (10th Cir. 2004) (noting the applicability of the law of the case doctrine to codefendants' claims). Accordingly, we are precluded from reconsidering this issue, and Mr. Irving is not entitled to relief.

## II.    Whether the Indictment Was Duplicitous

Mr. Irving next contends that, even if the indictment does sufficiently charge a crime, it is nevertheless duplicitous because it impermissibly charged

---

[12](...continued)
142 F.3d at 1247. None of these exceptions is applicable here to Mr. Irving's purely legal challenges to his indictment.

two crimes in a single count—that is, conspiracy *and* attempt. An identical legal challenge was rejected in Mr. Washington's appeal. *See Washington,* 653 F.3d at 1261–63. As with the other indictment challenge, *supra*, we conclude that the law of the case doctrine applies to this ruling in *Washington*. Consequently, we are prevented from revisiting it, and Mr. Irving's duplicity challenge must fail.

## III. Sufficiency of Evidence Supporting Mr. Irving's Convictions

Mr. Irving argues that there was insufficient evidence introduced at trial to support either of his convictions.

### A. Standard of Review

We review sufficiency-of-the-evidence claims de novo, "ask[ing] whether a reasonable jury could find a defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government and drawing reasonable inferences therefrom." *United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008). In so doing, we "will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury," *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007) (quoting *United States v. Summers*, 414 F.3d 1287, 1293 (10th Cir. 2005)) (internal quotation marks omitted), nor will we "examin[e] the evidence in 'bits and pieces,'" *United States v. Gallant*, 537 F.3d 1202, 1222–23 (10th Cir. 2008) (quoting *United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004)). Rather, "we evaluate the sufficiency of the evidence by

14

considering the collective inferences to be drawn from the evidence as a whole." *Nelson*, 383 F.3d at 1229 (quoting *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997)) (internal quotation marks omitted).

### B. Sufficiency of the Evidence Supporting the Drug Conviction (Count 1)

Mr. Irving argues that insufficient evidence was adduced at trial to support his conviction for possession of crack cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii). "To obtain a conviction for possessing a controlled substance with intent to distribute . . . , the government must establish the following elements beyond a reasonable doubt: (1) defendant possessed a controlled substance; (2) defendant knew he possessed a controlled substance; and (3) defendant intended to distribute the controlled substance." *United States v. Harris*, 369 F.3d 1157, 1163 (10th Cir. 2004); *accord United States v. Castorena-Jaime*, 285 F.3d 916, 933 (10th Cir. 2002). Mr. Irving argues that "[n]o video showed any exchange of drugs for money" and "no law enforcement officer [on surveillance at the buy] observed any drugs," and insists, therefore, that "[t]he possibility that Mr. Banks already had the cocaine base [wa]s not disproven beyond a reasonable doubt." Aplt. Opening Br. at 19–20. As Mr. Irving sees it, he provided an explanation for why he took the money from Mr. Banks (repayment of a loan) and for why Mr. Banks might falsely implicate him (receiving benefits from law enforcement), and,

15

consequently, "[t]here simply is insufficient evidence for a[] reasonable jury to have found [him] guilty beyond a reasonable doubt." *Id.* at 20.

Mr. Irving's claim is without merit. The record more than adequately supports the jury's finding that Mr. Irving possessed crack cocaine with the intent to distribute. Of particular significance is the fact that Mr. Irving was arrested following a controlled buy that strictly adhered to an established protocol: the confidential informant and his vehicle were searched prior to and after the sale; the controlled buy was conducted under police surveillance, and nobody approached the vehicle during the operation except for Mr. Irving; and following the transaction, the confidential informant drove directly to the police and turned over the drugs. These facts were attested to at trial by members of the police, including Officer Hix, the orchestrating law enforcement official, and by the confidential informant himself. This alone is sufficient to allow a reasonable jury to conclude, beyond a reasonable doubt, that Mr. Irving possessed crack cocaine with the intent to distribute. *See, e.g.*, *Wilson*, 107 F.3d at 779 ("The intent to distribute . . . cocaine could be inferred from [the orchestrating officer's] description of the events surrounding the 'controlled buy.' While [the officer] did not actually observe Mr. Wilson sell the cocaine to the confidential informant, he did observe Mr. Wilson greet the informant in the yard and lead him into the house where the purchase occurred.").

This point is underscored by this court's decision in *United States v. [Patrick] Washington*, 11 F.3d 1510 (10th Cir. 1993). In that case, the defendant was convicted of three counts of distribution of crack cocaine following his involvement in three controlled buys with a FBI confidential informant. *Id.* at 1512–13. Although protocol dictates both that controlled buys be preceded by a search of the confidential informant and that the buy be subject to uninterrupted surveillance, the government admitted that neither of those things happened in two of the three buys. *Id.* at 1513. The confidential informant was, however, equipped with a recording device for all of the buys, which evidence showed had not been tampered with. *Id.*

At trial, the government relied primarily on the testimony of the confidential informant and the orchestrating officer, along with the audiotapes from the controlled buys, to prove the defendant possessed crack cocaine with intent to distribute. *Id.* at 1515. The defendant, for his part, denied selling the confidential informant drugs on those dates, claiming that he had taken the money from the confidential informant to cover debts that were owed from earlier drug transactions, and that he had sold the confidential informant Vitablend in an effort to recover on those debts. *Id.* The defendant further "argue[d] that after each buy [the confidential informant] procured the recovered cocaine base from another source, or . . . it was otherwise available to him." *Id.* The confidential informant actually "acknowledged outstanding debts to [the] defendant." *Id.* Nonetheless,

17

we concluded that, "[d]espite some discrepancies in the testimony of the FBI agents and [the confidential informant], and opportunities during each buy for [the confidential informant] to misappropriate the contraband, a reasonable jury could believe that defendant engaged in drug trafficking on the three dates listed in the indictment." *Id.*

Given that the deficiencies in the controlled buys present in *[Patrick] Washington* were not present here, we conclude with even greater force that a reasonable jury could find that Mr. Irving sold crack cocaine to Mr. Banks during the August 25, 2008, controlled buy. Moreover, the government points to Officer Hix's testimony concerning the cryptic nature of the recorded calls between Mr. Irving and Mr. Banks. Officer Hix testified that Mr. Irving's cryptic communications were consistent with the behavior of drug dealers, who "always think that the police are listening to their phone calls, so they don't want to talk about exactly what they are doing on the phone." R., Vol. II, at 118. This testimony lends further support to our conclusion that the evidence was sufficient to establish Mr. Irving's guilt.

To be sure, Mr. Irving offered an elaborate explanation for everything—from why he was so evasive on the phone, to how he wound up with the money. However, we do not "weigh conflicting evidence or second-guess the fact-finding decisions of the jury" when assessing the sufficiency of the evidence. *Sells*, 477 F.3d at 1235. The jury found Mr. Irving guilty of possession of crack

18

cocaine with intent to distribute, and it is clear that the record is more than adequate to support that conclusion.  Accordingly, Mr. Irving is not entitled to relief on this claim.

### C.   Sufficiency of the Evidence Supporting the Witness-Tampering Conviction (Count 2)

Mr. Irving next argues that there was insufficient evidence to support his conviction for witness tampering.  In order to establish Mr. Irving's guilt under the witness-tampering statute, 18 U.S.C. § 1512(a)(1)(A), "the government was required to prove beyond a reasonable doubt (1) that [he] knowingly attempted to kill [Lt. Stark] and (2) that he did so with the intent to prevent [Lt. Stark's] attendance or testimony at an official proceeding."  *Washington*, 653 F.3d at 1264 (alteration in original) (quoting *United States v. Rose*, 362 F.3d 1059, 1067 (8th Cir. 2004)) (internal quotation marks omitted); *accord* 18 U.S.C. § 1512(a)(1)(A). An attempt requires both (1) an "intent to commit the substantive offense," and (2) the "commission of an act which constitutes a substantial step towards commission of the substantive offense."  *Vigil*, 523 F.3d at 1267 (quoting *United States v. Smith*, 264 F.3d 1012, 1015 (10th Cir. 2001)) (internal quotation marks omitted).

A highly fact-specific inquiry is necessary to properly assess whether a defendant's actions amount to an "attempt," and, in particular, whether his actions qualify as a "substantial step."  *See United States v. DeSantiago-Flores*, 107 F.3d

19

1472, 1479 (10th Cir. 1997) ("The dividing line between preparation and attempt is not clear and depends to a high degree on the surrounding factual circumstances."), *overruled on other grounds by United States v. Holland*, 116 F.3d 1353, 1359 n.4 (10th Cir. 1997); *see also United States v. Neal*, 78 F.3d 901, 906 (4th Cir. 1996) ("Whether conduct represents a substantial step depends on the 'surrounding factual circumstances' and, therefore, such determinations are necessarily fact specific."); *United States v. Rivera-Sola*, 713 F.2d 866, 869 (1st Cir. 1983) (noting "the supreme importance of the facts in any attempt case").

"As courts invariably and correctly state, the question of when preparation ends and attempt begins is exceedingly difficult." *United States v. Prichard*, 781 F.2d 179, 181 (10th Cir. 1986); *see also Neal*, 78 F.3d at 906 ("The decisions are too numerous to cite and would not help much anyway, for there is, and obviously can be, no definite line [between preparation and attempt]" (alteration in original) (quoting *United States v. Coplon*, 185 F.2d 629, 633 (2d Cir. 1950) (internal quotation marks omitted)). "A substantial step must be something more than mere preparation," *Vigil*, 523 F.3d at 1267, "yet may be less than the last act necessary before the actual commission of the substantive crime," *United States v. Manley*, 632 F.2d 978, 987 (2d Cir. 1980); *see also United States v. Savaiano*, 843 F.2d 1280, 1298 (10th Cir. 1988) (noting that "[t]he realistic emphasis on what had been done, rather than dwelling on what remained to be done" is "consistent" with our case law); *Prichard*, 781 F.2d at 182 ("[M]odern 'attempt'

20

law allows criminal liability to attach at some point prior to the last proximate act.").  The fact that further, major steps remain "before the crime can be completed does not preclude a finding that the steps already undertaken are substantial."  *Savaiano*, 843 F.2d at 1297 (emphasis omitted) (citation omitted) (internal quotation marks omitted); *see* Model Penal Code and Commentaries § 5.01 cmt. 6(a), at 329 (1985) [hereinafter MPC & Commentaries] ("[T]his formulation shifts the emphasis from what remains to be done, the chief concern of the proximity tests, to what the actor has already done.  That further *major* steps must be taken before the crime can be completed does not preclude a finding that the steps already undertaken are substantial." (emphasis added)).[13]

As the drafters of the Model Penal Code ("MPC") have noted, under such an approach "apprehension of dangerous persons will be facilitated and law enforcement officials and others will be able to stop the criminal effort at an earlier stage, thereby minimizing the risk of substantive harm, but without providing immunity for the offender."  MPC & Commentaries, *supra*, § 5.01 cmt. 6(a), at 331; *see United States v. Morris*, 549 F.3d 548, 550 (7th Cir. 2008) ("The purpose of the law of attempt is to nail a person who by his conduct has shown that had the attempt not been interrupted he would very likely have completed the

---

[13]    We have acknowledged that our "attempt" jurisprudence comports with that of the Model Penal Code.  *See United States v. Haynes*, 372 F.3d 1164, 1169 (10th Cir. 2004) (noting that the Model Penal Code's definition of attempt "resembles our law").

21

crime that he attempted."); MPC & Commentaries, *supra*, § 5.01 cmt. 1, at 298

(suggesting that the "proper focus" is on "the dangerousness of the actor").

Importantly, the act or acts "must be strongly corroborative of the firmness of the

defendant's criminal intent." *United States v. Bunney*, 705 F.2d 378, 381 (10th

Cir. 1983) (quoting *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir.

1974)) (internal quotation marks omitted); *see* MPC & Commentaries, *supra,* §

5.01 cmt. 1, at 298–99 ("Needless to say, the law must be concerned with

conduct, not with evil thoughts alone. . . . [T]he judgment is that conduct that

does not itself strongly corroborate the actor's criminal objective should be

excluded from liability.").

On appeal, Mr. Irving does not appear to challenge the sufficiency of the

evidence regarding his intent to kill Lt. Stark.  Rather, he attacks the evidence as

to the second element, maintaining that "no reasonable juror could have found

that the evidence established beyond a reasonable doubt that a substantial step

toward murder had been committed."  Aplt. Opening Br. at 20.  More specifically,

he claims that he took "[n]o overt act toward . . . murdering Lieutenant Stark,"

and notes that "no money exchanged hands and [he] never knew or spoke with

Mr. Washington."[14]  *Id.*  As he sees it, "there was no evidence of any actual

---

[14]     Mr. Irving uses the term "overt act" in making his argument about
the absence of sufficient proof of the attempt.  As the Supreme Court noted:

>        At common law, the attempt to commit a crime was itself a crime
>                                                        (continued...)

22

[14](...continued)

> if the perpetrator not only intended to commit the completed offense, but also performed some open deed tending to the execution of his intent. More recently, the requisite open deed has been described as an overt act that *constitutes a substantial step toward completing the offense*.

*United States v. Resendiz-Ponce*, 549 U.S. 102, 106–07 (2007) (emphasis added) (citations omitted) (quoting 2 Wayne LaFave, *Substantive Criminal Law* § 11.2(a) at 205 (2d ed. 2003)). The requirement of an overt act ensured that a defendant could not be convicted of just thinking about committing the substantive crime. *See, e.g.*, *United States v. Monholland*, 607 F.2d 1311, 1318 (10th Cir. 1979) ("The cases universally hold that mere intention to commit a specified crime does not amount to an attempt. It is essential that the defendant, with the intent of committing the particular crime, do some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime."); *accord United States v. Gladish*, 536 F.3d 646, 648 (7th Cir. 2008) ("You are not punished just for saying that you want or even intend to kill someone, because most such talk doesn't lead to action. You have to do something that makes it reasonably clear that had you not been interrupted or made a mistake—for example, the person you thought you were shooting was actually a clothier's manikin—you would have completed the crime.").

However, as *Resendiz-Ponce* suggests, in recent times the focus has been less on whether "the act is 'open' and thus perceptible to anyone who is there to observe it," Bryan A. Garner, *A Dictionary of Modern Legal Usage* 632–33 (2d ed. 1995), but rather on whether the act or acts constitute a substantial step toward the consummation of the crime. We used the term "overt act" in this sense in *Monholland*. *See, e.g.*, *Monholland*, 607 F.2d at 1318 ("The element which is lacking is some overt act which points directly to the object offense."); *id.* at 1320 ("There must be an overt act pointed directly to the commission of the crime charged."); *see also Rivera-Sola*, 713 F.2d at 869 (treating *Monholland*'s overt act discussion as consistent with an assessment of whether defendant committed a substantial step); 2 Kevin F. O'Malley, et al., *Federal Jury Practice and Instructions* § 21:03, at 4–5 (6th ed. 2008) [hereinafter *Federal Jury Practice*] (noting that *Monholland*'s language is "substantially similar" to the "substantial step" formulation of the Model Penal Code). Indeed, in *Monholland*, we quoted with approval the Fifth Circuit's formulation of the *actus reus* requirement of attempt, which expressly uses the term "substantial step," and we

(continued...)

tacitly indicated that this term was synonymous with the "overt act element." *Monholland*, 607 F.2d at 1319–20; *see Mandujano*, 499 F.2d at 376–77 (referring to cases from around the mid-twentieth century that use the term "overt act," but adopting a formulation of the *actus reus* of attempt that uses the term "substantial step"). Mr. Irving—who relies extensively on *Monholland*—appears to appreciate that the true focus is on the presence of a substantial step. *See, e.g.*, Aplt. Opening Br. at 20 ("A substantial step requires an overt act which is closely connected with the object crime; an appreciable fragment of the target crime must have been accomplished.").

Our more recent cases appear to have largely abandoned the use of the term "overt act" in describing the *actus reus* of the attempt offense, using solely the term "substantial step." *See, e.g.*, *United States v. Foy*, 641 F.3d 455, 467 (10th Cir. 2011); *Vigil*, 523 F.3d at 1267; *see also* Tenth Circuit Criminal Pattern Jury Instructions No. 1.32 (noting the attempt *actus reus* requirement that "defendant took a substantial step toward commission of that crime"). As evident from our discussion of *Monholland*, *supra*, this reflects a change of terminology, not of substantive approach. It is a change that expressly brings us in line with the MPC's terminology, and apparently that of many of our sister circuits. *See* MPC & Commentaries, *supra*, § 5.01(1)(c), at 296 (using the term "substantial step" in describing the *actus reus* of attempt); *Federal Jury Practice, supra,* § 21:03, at 4 (noting that its instruction using the term "substantial step" is "based upon an interpretation of Section 5.01 of the [MPC], which has been adopted by the majority of the courts of appeals"); *see also United States v. Valencia*, 907 F.2d 671, 684 n.14, 16 (7th Cir. 1990) (collecting cases adopting the substantial-step formulation and noting the shift of certain federal pattern jury instructions to this formulation); *Rivera-Sola*, 713 F.2d at 869 (noting that "the federal courts have rather uniformly adopted the standard found in Section 5.01" of the MPC).

In keeping with the practice of our more recent cases, we frame the *actus reus* requirement of attempt solely in terms of a substantial-step requirement and refer to it as such here. One ancillary benefit of this approach is that it reduces the risk of confusion with the concept of overt act, as it is used in the law of conspiracy. *See, e.g.*, 18 U.S.C. § 371 (noting as a required element of the general conspiracy statute that "one or more of such persons do any act to effect the object of the conspiracy"); *Wardell*, 591 F.3d at 1287 ("During the conspiracy, at least one of the coconspirators must commit an overt act in furtherance of the conspiracy."). In conspiracy law, given the existence of an

(continued...)

24

attempt to kill Lt. Stark, and a conspiracy or discussion cannot . . . substitute for the requirement that there be an overt act [i.e., substantial step] to convict for attempt to tamper with a witness." *Id.* at 22.

In making his argument, Mr. Irving relies heavily on *United States v. Monholland*, *supra*. In *Monholland*, we concluded that there was insufficient evidence to support a conviction for attempting to receive an explosive in interstate commerce because there "was nothing more than preliminary discussion" about the purchase of some dynamite. 607 F.2d at 1317. The attempt charge was one of several lodged against the defendants in prosecuting them for a scheme to kill a state trial judge by blowing up his vehicle. *Id.* at 1312. As relevant here, one defendant had asked an undercover government agent what the price of a box of dynamite would be, while viewing a stick of *simulated* dynamite, *id.* at 1313, and then later another defendant had asked the agent "what [he] would . . . take for" the dynamite that the agent possessed, *id.* at 1317 (internal quotation marks omitted). A price was never discussed, as the undercover agent told them the dynamite was not for sale, and there was no suggestion that the defendants actually had the money to pay for the explosives.

---

[14](...continued)
unlawful agreement, "virtually any act will satisfy the overt act requirement." Wayne R. LaFave, *Substantive Criminal Law* § 12.2(b), at 627 (4th ed. 2003). In other words, the overt act need not necessarily be substantial. *Cf. Savaiano*, 843 F.2d at 1292 ("Attempt must include proof of a substantial step directed toward actual consummation of the crime, while conspiracy need not.").

*Id.* at 1313.  We concluded, therefore, that this evidence, "consisting as it does of *mere abstract talk*," could not show a substantial step towards completion of the crime.  *Id.* at 1318 (emphasis added).  We reasoned that

> mere acts of preparation, not proximately leading to the consummation of the intended crime, will not suffice to establish an attempt to commit it, especially when made at a distance from the place where the substantive offense is to be committed, for there must be some act moving directly toward the commission of the offense after the preparations are made.

*Id.*

In *Monholland*, while we held that "mere abstract talk" was not a substantial step, we also observed that "[i]f the activity had proceeded to a further length, that is, if a tangible act which constituted proximate and tangible evidence of a real effort had emerged, the government's [charge] would be more tenable." *Id.* at 1317.  The government contends that this is just such a case.  It claims that Mr. Irving "progressed over the course of three years from a general solicitation in 2006 to specific plans with Collins and his hitman in 2009."  Aplee. Br. at 30–31.  The government emphasizes that Mr. Irving's "communications were increasingly specific and were buttressed by his providing bail money to Collins," and concludes that "[Mr. Irving's] words were no offhand comments[—they] strongly indicated his intent to end an officer's life."  *Id.* at 31.

We agree that *Monholland*'s holding does not bar a conclusion that Mr. Irving's conduct amounted to a substantial step.  At the outset of our analysis,

26

however, we must identify the factual universe that is relevant to our decision. In its briefing, the government relies in part on the acts of Mr. Washington to provide the predicate substantial step beyond "mere preparation." *See, e.g.*, Aplee. Br. at 28–29 ("Here . . . the hitman[,] who was stopped after traveling 45 minutes away from his home in Tulsa to Muskogee where Stark lives, was literally 'moving directly toward the commission of the crime.'"). We note, however, that Mr. Irving was not charged with a conspiracy offense for his participation in the murder-for-hire plan with Mr. Washington, nor did the district court instruct the jury that it could rest Mr. Irving's conviction on an aiding-and-abetting theory. Therefore, it is at least open to question whether Mr. Washington's conduct could permissibly be attributed to Mr. Irving for purposes of determining whether there is sufficient evidence to establish Mr. Irving's guilt of the witness-tampering offense. *Compare Wardell*, 591 F.3d at 1306 n.16 (noting the fact that "conspirators can be held responsible for overt acts of their coconspirators undertaken in furtherance of the conspiracy" has "long been settled law"), *and United States v. Smith*, 962 F.2d 923, 929 n.2 (9th Cir. 1992) ("If such an individual is convicted of participating in a conspiracy to possess illegal narcotics, he may, of course, be convicted of an attempt offense based on the conduct of his co-conspirators."), *with United States v. Bowen*, 527 F.3d 1065, 1078 (10th Cir. 2008) ("[A]iding and abetting liability allows a jury to hold an aider and abetter responsible for a substantive offens[e] to the same extent as a

27

principal, even though his act was not the cause of the substantive harm."), *and Smith*, 962 F.2d at 930 n.3 ("We note that the evidence also might be sufficient to support Smith's conviction of attempted possession on an aiding and abetting theory. The record reveals that the district court gave the jury an aiding and abetting instruction."), *and United States v. Cronic*, 900 F.2d 1511, 1515 n.3 (10th Cir. 1990) ("The[] instructions are therefore the law of this case, and the evidence must conform to them to support the conviction."). We need not (and do not) answer that question in this case, however. Because even if we assume, *arguendo*, that we may look only to Mr. Irving's conduct in assessing whether there was sufficient evidence to find him guilty of witness tampering—that is, even if we adopt the position favorable to Mr. Irving that his conduct, alone, fully comprises the factual universe relevant to our inquiry—Mr. Irving cannot prevail on his sufficiency-of-the-evidence challenge.[15]

---

[15] To avoid any confusion regarding the scope of our inquiry, we underscore that Mr. Irving was not acting alone in seeking to commit the witness-tampering offense; it was a joint venture, involving Mr. Washington. Consequently, although we assume without deciding that Mr. Washington's acts cannot be deemed under the law *equivalent to* Mr. Irving's acts (i.e., treated as if Mr. Irving did them), a rational jury could have permissibly considered Mr. Washington's acts in assessing whether *Mr. Irving's conduct* amounted to a substantial step toward the consummation of the witness-tampering offense (i.e., the killing of Lt. Stark)—*viz.*, whether Mr. Irving's conduct was strongly corroborative of his intent that the offense be completed. In part, this is so, because Mr. Irving was guiding the conduct of Mr. Washington through his communications with Mr. Collins. *Cf. Smith*, 962 F.2d at 930–31 ("[E]ach participant in the joint venture did all that he could do to ensure the deal's completion. If the deal had been completed as planned, without any interference,

(continued...)

28

Turning now to *Monholland*, we conclude that it is clearly distinguishable. As we characterized the evidence:

> All that you have here is the evidence quoted above that the stick of simulated dynamite was held by one of the defendants and seen by the other and an inquiry about whether or not it could be sold. This is a far cry from transporting or receiving or attempting to transport or receive in commerce any explosive with knowledge that it will be used to kill or destroy.

*Monholland*, 607 F.2d at 1317–18. More specifically, "[o]ne problem [wa]s that the evidence d[id] not disclose anything approximating actual explosives or blasting materials." *Id.* at 1317. Furthermore, as noted, there was no discussion of a specific price for the explosives or indication that the defendants had the present ability to pay for them. *Id.* Indeed, as to the latter point, there was some reason to doubt that they did: in discussing the payment for the proposed hit on the judge with the undercover agent, one defendant noted that "he was trying to get the money" and the other said that "he did not have the money on hand and would have to borrow it or rustle some cattle to get it." *Id.* at 1313. In short, there was no evidence in *Monholland* that made the subject matter of the discussions between the defendants and the undercover agent concrete and specific, such that the evidence could be considered strongly corroborative of the

---

[15](...continued)
[the defendant charged with attempt] would not have been required to engage in any further acts. . . . Under those circumstances, a jury could certainly conclude that [the defendant's] conduct went beyond mere preparation.").

29

defendants' intent to commit the attempted-receipt crime. In other words, there was no evidence that took the discussions between the defendants and the undercover agent beyond the realm of "mere abstract talk." *Id.* at 1318.

Here, in contrast, not only did Mr. Irving and Mr. Collins have a series of discussions about the possible hit on Lt. Stark, they reached a concrete agreement for the hit and settled on a definite price ($50,000) and the form of the payment (i.e., cash, with one-half up front). Furthermore, in multiple conversations, they made their deal more specific and definite, among other things, confirming the payment terms and discussing who was responsible for getting the murder weapon. And, unlike *Monholland*, there was evidence that Mr. Irving took "tangible act[s]" that displayed "a real effort" to ensure the success of the hit, *id.* at 1317, including when he made the arrangements to get Mr. Collins (who would coordinate the hit) bonded out of jail and put up the money for the bond. Thus, *Monholland* is distinguishable and does not suggest that Mr. Irving's conduct could not amount to a substantial step toward the consummation of the witness-tampering crime, which would involve a hit on Lt. Stark. *See United States v. Mims*, 812 F.2d 1068, 1078 (8th Cir. 1987) ("[I]n the present case we have more than 'general conversation' or 'mere abstract talk.' [Defendant] repeatedly contacted [a narcotics supplier] and offered definite sums of money for some quantity of heroin. He further indicated that he had taken action to secure the

30

money. [Defendant's] acts were directly aimed at the commission of the offense of attempting to possess heroin.").

We affirmatively conclude that three aspects of Mr. Irving's conduct, *viewed in the aggregate*, constitute a substantial step that is strongly corroborative of Mr. Irving's intent that the witness-tampering offense be completed (i.e., that Lt. Stark be killed). Specifically, we point to (1) Mr. Irving's active solicitation of someone to kill Lt. Stark (i.e., his active solicitation of Mr. Collins to implement Mr. Irving's plan to kill Lt. Stark, with the aid of the trigger-man, Mr. Washington); (2) his actual consummation of a murder-for-hire contract with Messrs. Collins and Washington; and (3) his concrete actions to facilitate the completion of the contract, such as bonding Mr. Collins out of jail.

Our conclusion is entirely consistent with the purposes of modern attempt law, which puts "[t]he realistic emphasis on what had been done, rather than dwelling on what remained to be done," *Savaiano* 843 F.2d at 1298, and makes "the proper focus of attention [] the actor's disposition," that is, "the dangerousness of the actor," MPC & Commentaries, *supra*, § 5.01 cmt. 1, at 298; *see United States v. Dworken*, 855 F.2d 12, 17 (1st Cir. 1988) (noting that the MPC's focus on the actor's dangerousness "furthers one of the animating purposes of the [MPC]—to develop a legal basis for dealing with individuals whose conduct indicates that they are disposed toward future criminal activity");

31

*cf. Smith*, 962 F.2d at 930–31 ("[E]ach participant in the joint venture did *all that he could do* to ensure the deal's completion. . . . In fact, [the defendant charged with attempt] committed *all the steps necessary on his part* to the completion of the substantive offense." (emphasis added)).

In sum, Mr. Irving had negotiated and secured a contract for the murder of a witness (i.e., Lt. Stark), and had taken concrete and necessary steps to ensure that the crime was committed, which were strongly corroborative of his criminal intent. The law of attempt was intended to address such wrongdoing. The drafters of the MPC make the point well:

> When a person is seriously dedicated to commission of a crime, a firm legal basis is needed for the intervention of the agencies of law enforcement to prevent its consummation. . . . [L]ines should not be drawn so rigidly that the police confront insoluble dilemmas in deciding when to intervene, facing the risk that if they wait the crime may be committed while if they act they may not yet have any valid charge.

MPC & Commentaries, *supra*, art. 5 intro., at 294.[16]

---

[16] The drafters offer further instructive discussion of the purposes animating this area of the criminal law:

> Conduct designed to cause or culminate in the commission of a crime obviously yields an indication that the actor is disposed towards such activity, not alone on this occasion but on others. There is a need, therefore, subject again to proper safeguards, for a legal basis upon which the special danger that such individuals present may be assessed and dealt with. They must be made amenable to the corrective process that the law provides.

MPC & Commentaries, *supra*, art. 5 intro., at 294.

Moreover, in reaching this conclusion, we find useful guidance in the Seventh Circuit's decision in *United States v. Rovetuso*, 768 F.2d 809 (7th Cir. 1985). In *Rovetuso*, the defendants were charged with attempting to interfere with the testimony of a government witness, based upon evidence that they solicited an FBI informant to murder the witness and had taken concrete steps to ensure the success of the criminal endeavor. *Id.* at 813, 822–23. The evidence established that the defendants had solicited the informant to "kill a witness who was cooperating with the Federal government," *id.* at 813–14, had actually "hired" him to do the job and "agreed not only on the price to be paid to [the informant] for the murder of [the witness] but also as to the nature of the execution of [the witness] as well as the manner of disposing of his body," *id.* at 822. Furthermore, the defendants and the informant engaged in planning concerning the crime and, in that regard, the informant was "given information concerning [the witness's] place of employment, his residence, a description of his car and his license plate identification number." *Id.* at 823. The "only reason" that the defendants "withdrew the order to kill was their suspicion that [the informant] was a government agent." *Id.* at 822.

The *Rovetuso* court concluded that the evidence was "more than sufficient to sustain the jury's verdict" on the attempt charge, *id.*, and that it was "strongly corroborative of the intent to murder" because it "went beyond mere asking" in that it "clearly revealed an arrangement between the defendants and [the

33

informant]" to "complete the final act of murder," *id.* at 823. Relatedly, the court

concluded that it "need not reach the issue of whether the jury might conclude

from the jury instruction that merely *seeking* to obtain a hit man is *sufficient* in

and of itself to constitute a substantial step." *Id.* (emphasis added). That was

because the jury's reference to "*securing* a hit man" in a note to the trial judge,

according to the *Rovetuso* court, made it "obvious that the jury was satisfied that

the defendants and [the informant] had agreed on murdering [the witness]" and,

due to the jury's note, the court was likewise "satisfie[d] [] that the jury

considered all of the defendants['] actions." *Id.*

Like the *Rovetuso* court, we need not decide whether Mr. Irving's active

solicitation of someone to kill Lt. Stark would be *sufficient* in itself to establish a

substantial step under the law of attempt, such that Mr. Irving could be convicted

of witness tampering.[17] As in *Rovetuso*, the "arrangement" between Mr. Irving

---

[17] In the context of determining that solicitation to commit burglary of a dwelling is a crime of violence under U.S. Sentencing Guidelines Manual § 2L1.2, we have noted that "[i]n many jurisdictions, soliciting another person to engage in criminal conduct can satisfy the substantial step requirement for an attempt." *United States v. Cornelio-Pena*, 435 F.3d 1279, 1287 (10th Cir. 2006). *See generally United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1120, 1121 & n.13 (5th Cir. 1984) (collecting cases where solicitation can constitute an attempt, and noting that "several federal courts have concluded that a solicitation accompanied by the requisite intent may constitute an attempt"); MPC & Commentaries, *supra*, § 5.01(2)(g) & explanatory note, at 296–97 (including "solicitat[ion] of an innocent agent" to engage in the criminal endeavor among a "list of kinds of conduct that corresponds with patterns found in common law cases," that, "if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law"). More specifically, in assessing whether

(continued...)

and Messrs. Collins and Washington "went far beyond merely 'seeking' to obtain the services of a hit man." *Id.* Mr. Irving actually hired (i.e., "secured") the two men to kill Lt. Stark and agreed on a price for the killing (i.e., $50,000) and a form of payment (i.e., one-half of the cash payment up-front). Furthermore, similar to *Rovetuso*, Mr. Irving and Mr. Collins engaged in planning discussions relating to where the killing would take place (i.e., Muskogee) and how it would be accomplished (i.e., with a gun supplied by Mr. Collins), and Mr. Irving took concrete action to facilitate the achievement of the criminal objective, including arranging for Mr. Collins's release from jail on bond and paying for the bond. While the evidence here is not as overwhelming as in *Rovetuso* and arguably was not *"more than sufficient"* to sustain the jury's verdict, *id.* at 822 (emphasis added), we are confident that the evidence of Mr. Irving's conduct—specifically, the three aspects identified above relating to his solicitation and hiring of a hit man to kill Lt. Stark and his concrete conduct to "complete the final act of

---

[17](...continued)
the crime of solicitation was "sufficiently similar to the offenses listed" in the Sentencing Guidelines commentary concerning a crime of violence, we stated that "although the *actus reus* requirement for an attempt must go beyond mere preparation, it need not be a greater act than that required for solicitation." *Cornelio-Pena*, 435 F.3d at 1286–87. Because Mr. Irving's conduct "went far beyond merely 'seeking' to obtain the services of a hit man," *Rovetuso*, 768 F.2d at 823—that is, far beyond solicitation—we need not determine whether *Cornelio-Pena*'s language extends beyond the Sentencing Guidelines context of that case and indicates that the act of soliciting someone to commit a murder of a government witness would be *sufficient* in itself to establish a substantial step under the law of attempt.

35

murder," *id.* at 823—when viewed in the aggregate, clearly *was sufficient* to constitute a substantial step, strongly corroborative of his criminal intent, and thus legally sound under the law of attempt.[18]

Moreover, although it arises in the context of an objection to an obstruction-of-justice enhancement under U. S. Sentencing Guidelines Manual § 3C1.1, the Eighth Circuit's decision in *United States v. Wahlstrom*, 588 F.3d 538 (8th Cir. 2009), is also instructive. "The obstruction enhancement was based on evidence that while Wahlstrom was in custody awaiting disposition of his charges, he attempted to hire someone to murder the wife of the Assistant United States Attorney prosecuting his case." *Id.* at 541. Mr. Wahlstrom argued that his scheme was "mere talk" and did not amount to a substantial step that would warrant a § 3C1.1 enhancement for attempted obstruction of justice. *Id.* at 543. The evidence indicated that Mr. Wahlstrom had approached another inmate and inquired "whether he knew anyone who would carry out a hit on the prosecutor's wife." *Id.* at 541. The inmate told Mr. Wahlstrom that his brother would do it in return for a large sum of money. Mr. Wahlstrom indicated that he "did not have enough cash, but would discuss giving [the inmate's] brother vehicles as

---

[18]    For an instructive district court case that upholds a defendant's conviction for attempted witness-tampering, after concluding that defendant's oral and (mostly) written communications from jail that were designed to coordinate hits on three witnesses "went beyond mere preparation" and amounted to a substantial step, see *United States v. Augustin*, No. 1:09-CR-187, 2011 WL 294281, at *6 (E.D. Tenn. Jan. 27, 2011).

payment." *Id.* Unbeknownst to Mr. Wahlstrom, the inmate elected to cooperate with law enforcement. The inmate arranged for a telephone call between Mr. Wahlstrom and "a deputy sheriff posing as [the inmate's] brother, ostensibly to discuss payment for the hit." *Id.* During the call, Mr. Wahlstrom discussed with the undercover deputy (posing as the inmate's brother) the idea of paying him with a $70,000 vehicle. When the deputy expressed interest in getting "some cash," Mr. Wahlstrom indicated that he would "work that out" with the inmate. *Id.* at 542 (internal quotation marks omitted). When the deputy pressed Mr. Wahlstrom to indicate when he "want[ed] that thing done," *id.* at 541 (internal quotation marks omitted), Mr. Wahlstrom indicated that the deputy could "play it by ear," *id.* at 542 (internal quotation marks omitted), and expressed concern about discussing the matter on the phone. In light of these facts, the Eighth Circuit rejected Mr. Wahlstrom's contention that his actions amounted to "mere talk," not rising to the level of a substantial step. *Id.* at 543. The court noted that Mr. Wahlstrom had contacted a fellow inmate for assistance in getting someone to do the hit and then discussed payment in a telephone conversation with the ostensibly willing assassin and that "[t]hese actions were both necessary to the consummation of the scheme and strongly corroborative of Wahlstrom's criminal intent." *Id.*

The reasoning and outcome in *Wahlstrom* should apply with even greater force here. Mr. Irving took similar steps as those of Mr. Wahlstrom: he solicited

37

Mr. Collins to find a willing assassin to kill Lt. Stark (i.e., Mr. Washington) and he offered a definite price for the job (i.e., $50,000) in a conversation to Mr. Collins. But there was much more here. Although the facts of *Wahlstrom* permit some uncertainty as to whether Mr. Wahlstrom actually finalized the murder-for-hire contract with the faux assassin—given Mr. Wahlstrom's comment, in response to the assassin's stated desire for some cash, that he would need to work that out with the inmate (the assassin's pretend brother)—there was no such uncertainty here. Mr. Irving and Mr. Collins reached an agreement for the hit and settled on a price and the form of the payment (i.e., cash, with one-half up front). Moreover, Mr. Irving did not just have one telephone conversation with those who would carry out the hit, like Mr. Wahlstrom. Instead, Mr. Irving had multiple conversations with Collins, among other things, to confirm the payment terms, to discuss who was responsible for getting the murder weapon, and to urge Mr. Collins to move forward with the plan (i.e., "Shit, come on!," Aplee. Addendum of Exs., Ex. 34). Furthermore, Mr. Irving took a concrete step that was "necessary to the consummation of the scheme and strongly corroborative of [his] criminal intent," *Wahlstrom*, 588 F.3d at 543, when he arranged for Mr. Collins to be bonded out of jail. Thus, as the reasoning of *Wahlstrom* strongly indicates, a rational jury could find that Mr. Irving's conduct amounted to a substantial step.

38

In sum, based upon the foregoing reasoning, we conclude that Mr. Irving's challenge to the sufficiency of the evidence regarding his witness-tampering conviction must fail.

## IV. Whether the District Court Abused Its Discretion in Excluding Terry Warrior's Testimony

Mr. Irving next asserts that the district court abused its discretion when it refused to allow Terry Warrior to testify. Mr. Irving's codefendant, Mr. Washington, also raised this contention of error, and we detailed the factual circumstances underlying it in our prior opinion disposing of Mr. Washington's appeal. *See Washington*, 653 F.3d at 1266–68. We will not fully repeat that factual statement here. But we do provide a summary of the relevant circumstances in order to provide a necessary context for our legal resolution of this challenge. At the start of the trial, the district court invoked the Rule of Sequestration, ordering that "anyone who is in the courtroom, except the parties, who [is] going to be a witness in the case or potentially be a witness must excuse themselves now." R., Vol. II, at 35.

Despite the court's warnings that potential witnesses should leave the courtroom, Ms. Warrior remained, watching her son, Sean Warrior, testify for the defense.[19] Sean testified regarding the communications between Mr. Collins and

---

[19] As noted above, Sean Warrior and Milton Warrior—who are cousins—possessed the cell phones used by Mr. Irving and Mr. Collins to communicate while in prison in February 2009. Milton testified on behalf of the

(continued...)

39

Mr. Irving by phone in jail. Sean indicated that there were two brief calls between the men. According to Sean, Mr. Collins had to remind Mr. Irving of who he was; Mr. Irving indicated that he only knew Mr. Collins "a little bit," *id.* at 681; and, when Mr. Collins suggested to Mr. Irving that he needed "to get his money together" in order "to get [Mr. Collins] out of there [i.e., jail]," Mr. Irving remarked, "I don't even know you like that," and "hung up the phone" on Mr. Collins, *id.* at 679–80. Sean also testified about Milton Warrior's supposedly dishonest character and possible motive for testifying on behalf of the government.

On cross-examination, the government attempted to discredit Sean's testimony by suggesting that it may have been the product of witness intimidation. In particular, the government inquired whether his mother, Ms. Warrior, had been threatened at gunpoint during a home invasion roughly a month prior to trial; whether in connection with the alleged home invasion something had been said to Ms. Warrior about someone testifying; and whether the perpetrator mentioned Mr. Washington or a nickname for him. Sean acknowledged that there had been a home invasion and that his mother had been threatened with a gun, but he denied that there was any mention of his testimony,

---

[19](...continued)
government. Sean, on the other hand, testified favorably on behalf of the defense.

40

or Mr. Washington or his nickname. Referring to his mother, Sean suggested that the district court "ask her [directly]. She is right there." *Id.* at 717.

Mr. Washington's attorney, who had previously been unaware of Ms. Warrior or her presence in the courtroom that day, later sought to have her testify to the fact that no threat was made during the robbery—testimony that would have served to undermine the government's suggestion that Sean's testimony was coerced. Noting that Ms. Warrior was present during her son's testimony—thereby violating the court's sequestration order—the district court excluded Ms. Warrior as a witness. Mr. Washington's counsel then made a proffer of Ms. Warrior's expected testimony: he indicated that Ms. Warrior "would deny on the stand that there were any threats made concerning testifying . . . [and] deny that there were any statements made regarding [Mr. Washington]" during the break in. *Id.* at 755–56.

Subsequently during the trial, Mr. Washington's attorney again requested to call Ms. Warrior. Counsel underscored that he "had no idea who the lady was sitting back there," and noted, moreover, that he was unaware of "any Terry Warrior line of inquiry with Sean Warrior," making it impossible for him to know that Ms. Warrior's presence would present any concerns. *Id.* at 821. The district court again excluded Ms. Warrior's testimony "because she was present for the testimony [of Sean] and that's a violation of the Rule of Sequestration." *Id.* at 820–21. The district court did not conduct an inquiry

41

concerning the probability that the defendants might incur prejudice from the

exclusion of Ms. Warrior's testimony.  Significantly, the effort to introduce the

testimony of Ms. Warrior was made *solely* by Mr. Washington's counsel.  At no

point did Mr. Irving's counsel seek to introduce her testimony or object to its

exclusion.  Nevertheless, Mr. Irving now challenges the exclusion of Ms.

Warrior's testimony.[20]

_____

[20]  Mr. Irving also alleges that "there was no violation of the Rule of Sequestration at all."  Aplt. Opening Br. at 28.  He maintains that Ms. Warrior "was on [no] party's witness list, and did not know she would be mentioned or called to testify," and that the defense counsel was unaware of "the home invasion or that the Government would mention a threat made to her regarding Sean Warrior's testimony as affecting Sean's credibility."  *Id.*  "If there has been no admonition and no notice," Mr. Irving reasons, "and the Government's knowledge and failure to disclose is the sole cause for not sequestering a person of interest in the prosecution's case, how can either Mr. Irving, Mr. Washington, or Ms. Warrior have violated the Rule?"  *Id.*

We will not consider Mr. Irving's contention on this point.  He did not raise any objections to the exclusion of Ms. Warrior's testimony before the district court, much less contend that she did not violate the Rule of Sequestration.  Consequently, as noted *infra*, insofar as Mr. Irving may be heard at all concerning the exclusion of Ms. Warrior, the scope of his argument is conterminous with the scope of the argument previously advanced by Mr. Washington.  Mr. Washington's argument focused solely on the *remedy* for Ms. Warrior's violation of the Rule of Sequestration; he did not question that she in fact violated the rule.  *See, e.g.*, Case No. 10-7013, Aplt. (Washington's) Opening Br. at 8 (10th Cir., filed Sept. 10, 2010) ("The district court abused its discretion by disallowing testimony from Terry Warrior, a defense witness, *based on violation of the Rule of Sequestration*." (emphasis added)).  Not surprisingly, we therefore operated on the premise that she had committed a violation and turned to the question of the proper remedy.  *See Washington*, 653 F.3d at 1269 ("Although Ms. Warrior was unquestionably present for the testimony of her son, and, as the district court noted, this was the only testimony that would have had any relevance to her own statements, this does not in-and-of-itself warrant exclusion.").  As we discuss

(continued...)

## A.    Standard of Review

Ordinarily, "[w]e review for abuse of discretion a district court's sequestration decisions." *United States ex rel. Bahrani v. ConAgra, Inc.*, 624 F.3d 1275, 1296 (10th Cir. 2010).  In this instance, however, both parties acknowledge that Mr. Irving failed to independently object before the district court to Ms. Warrior's exclusion.  The government appears to indicate that Mr. Irving therefore forfeited or waived this argument.  *See* Aplee Br. at 41 ("[Mr. Irving] offers no legal support for [his] attempt on appeal to preserve any error by piggy-backing on his co-defendant's objection.").  Mr. Irving, in contrast, contends that Mr. Washington's objections sufficiently preserved this issue for appeal because he was "directly affected by the exclusion of her testimony because of the way the prosecution used its examination of Sean Warrior to imply that a home invasion . . . caused him to change his testimony," and "[t]herefore the objection[] lodged by [Mr. Washington] . . . w[as] applicable to [him]."  Aplt. Opening Br. at 24.

---

[20](...continued)
*infra*, our reasoning in *Washington* on this issue—including the ultimate determination that the district court did err in excluding Ms. Warrior's testimony—is law of the case for this appeal and we are precluded from revisiting it.  Therefore, we will not address Mr. Irving's argument that Ms. Warrior did not actually violate the Rule of Sequestration.

Whether Mr. Washington's objection was enough to preserve this claim for Mr. Irving is a debatable question.[21]  *Compare Howard v. Gonzalez*, 658 F.2d 352, 356 (5th Cir. 1981) ("[W]hen one co-party objects [to an evidentiary issue] and thereby brings the matter to the attention of the court, further objections by other co-parties are unnecessary."), *and* 21 Charles Alan Wright, et al., *Federal Practice and Procedure* § 5036.9, at 695 (2d ed. 2005) (noting that commentators have argued that "vicarious objections" satisfy "most of the policies of Rule 103, such as alerting the judge of the desire for a ruling, stating the grounds therefore, and allowing the opponent to obviate the objection—if this is possible"), *with United States v. Warfield*, 97 F.3d 1014, 1024 (8th Cir. 1996) ("A review of the transcript indicates that Warfield's counsel, not Thomas's counsel, strenuously argued in favor of permitting inquiry into [details of the witness's double murder

---

[21]     Mr. Irving contends that, "if this Court nonetheless finds that [he] did not preserve this error for appeal, then [he] asserts that this was ineffective assistance of counsel."  Aplt. Opening Br. at 24 n.5.  We, of course, do not generally review claims of ineffective assistance of counsel on direct appeal.  *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc) ("Ineffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal.  Such claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed."); *accord United States v. Polly*, 630 F.3d 991, 1003 (10th Cir. 2011); *United States v. Bergman*, 599 F.3d 1142, 1149 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 219 (2010).  Moreover, Mr. Irving's cursory ineffective-assistance assertion—without reference to any legal authority—is not, itself, sufficient to support the claim.  *See Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1223 n.6 (10th Cir. 2008) (requiring a "reasoned argument as to the grounds for the appeal"); *see also* Fed. R. App. P. 28(a)(9)(A) ("The appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies[.]").

and plea agreement] and lodged a specific objection when the district court rejected Warfield's counsel's argument.  At no time did Thomas make any argument, or more importantly, lodge any objection to the district court's denial of this request.  Thomas has therefore waived this issue.").  Insofar as evidentiary issues are concerned, this court has yet to take a position on vicarious objections. *See United States v. Ray,* 370 F.3d 1039, 1043 n.3 (10th Cir. 2004) ("Our ruling today is limited specifically to the sole issue raised on this appeal (i.e., the preservation of alleged instructional error when the complaining party neither offered the instruction nor offered an individualized objection) [and] does not [address] the issue of preservation with regard to evidentiary objections."), *rev'd on other grounds*, 543 U.S. 1109 (2005).  In this instance, we need not opine on this issue, because even assuming, *arguendo*, that the issue is preserved, Mr. Irving's claim nevertheless fails.

## B.    Analysis

Federal Rule of Evidence 615 authorizes a district court to "order witnesses excluded so that they cannot hear the testimony of other witnesses."  Fed. R. Evid. 615.  We have noted that "[t]he exclusion of witnesses from the courtroom during trial is a time-honored practice designed to prevent the shaping of testimony by hearing what other witnesses say."  *United States v. Johnston*, 578 F.2d 1352, 1355 (10th Cir. 1978); *see also United States v. Rugiero*, 20 F.3d 1387, 1392 (6th Cir. 1994) ("The statutory purpose of the rule requiring

45

sequestration of witnesses is to preclude coaching or the influencing of a witness'[s] testimony by another witness.").

Operating, as we do, on the assumption that Mr. Irving has preserved a challenge to the exclusion of Ms. Warrior's testimony, based upon the objection of Mr. Washington's counsel, it ineluctably follows that Mr. Irving stands in precisely the same position as Mr. Washington in claiming error in the district court's application of the relevant rule of law—that is, the Rule of Sequestration. In Mr. Washington's appeal, we concluded that the district court did err in applying this rule primarily because there were "no indicia of consent, connivance, procurement or knowledge" of Ms. Warrior's violation by defense counsel, and "the district court never paused to conduct even a semblance of a probable prejudice inquiry[.]" *Washington*, 653 F.3d at 1269 (citations omitted) (quoting *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 980 (10th Cir. 1996)) (internal quotation marks omitted); *United States v. Gibson*, 675 F.2d 825, 836 (6th Cir. 1982) (internal quotation marks omitted). This legal ruling from *Washington* is law of the case, and we are precluded from re-examining the matter. *See, e.g.*, *LaHue*, 261 F.3d at 1010; *Wardell*, 591 F.3d at 1308 n.16; *cf. Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1313, 1317–18 (11th Cir. 2000) (applying the law of the case doctrine in subsequent appeal involving same parties to preclude review of a prior panel's decision to uphold trial court's decision to admit certain evidence).

46

However, the conclusion of error did not end the inquiry in *Washington*. We proceeded there to conduct a harmless-error analysis and in fact determined that "the district court's error was harmless"—that is, "the district court's erroneous decision to exclude Ms. Warrior [did not] affect[] the substantial rights of Mr. Washington." *Washington*, 653 F.3d at 1270. Although we have applied the law of the case doctrine to preclude reconsideration of a harmless-error determination in the context of a criminal conspiracy, *see Wardell*, 591 F.3d at 1308 n.16, we are reluctant to do so in this instance and ultimately decide against that course. Harmless-error analysis is highly fact-intensive. *See United States v. Harriston*, 329 F.3d 779, 789 (11th Cir. 2003) ("[H]armless-error determinations are highly fact-intensive and will vary from case to case."); *Clark v. Moran*, 942 F.2d 24, 27 (1st Cir. 1991) (noting that, in conducting harmless-error analysis, "[t]he court must consider the evidence as a whole, weighing the effect of the tainted evidence against the effect of that evidence which was properly admitted"); *cf. United States v. Wilson*, 605 F.3d 985, 1013 (D.C. Cir. 2010) (contrasting harmless-error analysis "which focuses on the totality of evidence against a defendant" from a Confrontation Clause analysis, which centers on a particular witness), *cert. denied*, 131 S. Ct. 841 (2010). And, as noted *supra,* for purposes of this case, we assume without deciding that, in assessing whether there was sufficient evidence to find him guilty of witness tampering, the jury could only consider Mr. Irving's conduct. That is, it could *not* attribute the actions of

Mr. Washington (the defendant in the prior appeal) to Mr. Irving. Furthermore, the incriminating evidence before the jury with respect to Mr. Irving and Mr. Washington was not conterminous in substantial respects. Therefore, even if we are not obliged to, we deem it most prudent and in the interest of justice to consider ourselves liberated from the constraints of the law of the case doctrine regarding the harmless-error analysis. *Cf. LaHue*, 261 F.3d at 1010 (noting that one exception to the law of the case doctrine is "when the evidence in a subsequent trial is substantially different"); *Alvarez*, 142 F.3d at 1247 (same). Thus, we proceed to conduct an independent harmless-error analysis to determine whether the exclusion of Ms. Warrior's testimony affected Mr. Irving's substantial rights.

The government contends that, "[g]iven the overwhelming remainder of the evidence against [Mr. Irving], including his own voice on tape [and] his admitted presence at the Blockbuster drug deal, [Mr. Irving] cannot show that he was prejudiced even if the district court [was] too harsh." Aplee. Br. at 42. Mr. Irving counters by claiming that the exclusion was not harmless because Sean Warrior provided important testimony for the defense—*viz.*, that Milton Warrior, a "crucial witness" for the government, had reason to lie in favor of the prosecution and that "Mr. Irving wanted nothing to do with Mr. Collins or his

schemes"—and the exclusion of Ms. Warrior's testimony prevented him from repelling an attack on the reliability of his witness.[22]  Aplt. Opening Br. at 27–28.

In determining whether a particular error was harmless, we "should not consider the error in isolation, but rather should consider it in the context of the entire record."  28 *Moore's Federal Practice* § 652.03[1], at 652-8 (3d ed. 2011). "A non-constitutional error, such as a decision whether to admit or exclude evidence, is considered harmless 'unless a substantial right of [a] party is affected.'"  *United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999) (alteration in original) (quoting Fed. R. Evid. 103(a)).  An error affecting a substantial right of a party is an error that "had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect."  *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

Mr. Irving claims that Sean Warrior's testimony was integral to his defense because it painted a different picture of the relationship between Mr. Collins and

---

[22]     For clarity's sake, we expressly note that, as relevant here, Sean Warrior's testimony only pertained to the question of Mr. Irving's guilt or innocence of the witness-tampering charge.  His guilt or innocence of the drug-trafficking offense was not at issue.  Even if that were not correct, because Mr. Irving did not raise an independent objection to the exclusion of Ms. Warrior's testimony—such that any review of that issue in his appeal is predicated upon the objection of Mr. Washington—Mr. Irving's claim of prejudice can sweep no broader than Mr. Washington's.  And Mr. Washington claimed prejudice only in connection with the witness-tampering offense—the only offense with which he was charged. Thus, our harmless-error analysis is centered on the witness-tampering offense.

himself than that presented by the government—i.e., "that Mr. Irving wanted nothing to do with Mr. Collins or his schemes." Aplt. Opening Br. at 27. He further argues that the government was able to discredit Sean Warrior's testimony by suggesting that his story had been affected by a threat to his mother and, according to Mr. Irving, "when [he] tried to refute those unevidenced insinuations, the . . . witness was excluded." *Id.* at 30. Thus, according to Mr. Irving, "the prejudice . . . was substantial and devastating." *Id.* at 26. Contrary to Mr. Irving's assertions, we conclude that the district court's error was harmless.

First, there was substantial, independent evidence of guilt introduced at trial. Notably, this included multiple tape-recorded communications between Mr. Irving and Mr. Collins, which clearly reflected that Mr. Irving had more than a passing familiarity with Mr. Collins, that the men had a relationship centered at least in part on the criminal plan to kill Lt. Stark, and that Mr. Irving was firmly committed to effectuating that plan. On the other hand, Sean Warrior's testimony suggesting to the contrary, related to (at most) two brief telephone conversations between Mr. Irving and Mr. Collins. Furthermore, significantly, the evidence of guilt included testimony by Mr. Collins regarding the plot; testimony by Mr. Simmons that Mr. Irving had desired to have Lt. Stark killed as far back as 2006; and evidence that Mr. Irving had paid to get Mr. Collins out of jail. Thus, even if the court had permitted Ms. Warrior to testify and she had successfully

50

rehabilitated Sean Warrior's testimony regarding the coercion issue—that is, she had rebutted the prosecutor's suggestion that Sean Warrior's testimony was the product of coercion—any exculpatory benefit of his testimony would still have been far outweighed by the substantial, independent evidence of guilt.

Furthermore, even if Ms. Warrior had been allowed to testify, she would have only discredited the government's theory that Sean Warrior's testimony was influenced by coercion. She would not have been able to overcome the other inconsistencies that the government had identified in his testimony—including, for instance, the inconsistencies in the total number of conversations that he claimed transpired between Mr. Collins and Mr. Irving in jail, and whether or not he had actually listened to them at all. In other words, Sean Warrior's credibility with the jury was in doubt irrespective of the government's coercion theory, and Ms. Warrior's testimony would not have been able to fully rehabilitate it.[23] *See*

---

[23] At oral argument, there was some discussion regarding the possibility that the government's coercion theory regarding Sean Warrior's testimony could additionally prejudice Mr. Irving by indicating that he was involved in a separate instance of witness coercion. In other words, this evidence—which Ms. Warrior allegedly could have rebutted—demonstrated another incident of purported witness coercion or tampering by Mr. Irving, which arguably could have influenced the jury's decision on the witness-tampering charge. Mr. Irving never raised this argument in his appellate briefing: as framed up to the time of oral argument, Mr. Irving's prejudice contention rested solely on his inability to rehabilitate Sean Warrior's credibility and the veracity of his testimony. Mr. Irving has not given us any reason to refrain from our usual practice of treating issues raised for the first time in oral argument as waived. *See, e.g.*, *United States v. Rivera-Nevarez*, 418 F.3d 1104, 1112 n.12 (10th Cir. 2005) ("[I]ssues raised for the first time at oral argument are waived."); *United States v. Almaraz*,

(continued...)

*Washington*, 653 F.3d at 1270 (undertaking a very similar harmless-error analysis relating to Mr. Washington). Given the strong evidence of guilt that exists in this instance, and the inconsistencies in Sean Warrior's testimony that had otherwise been highlighted by the government, we conclude that the district court's error was harmless.

**V.     Whether the District Court Abused Its Discretion in Admitting Some of Lt. Stark's Testimony**

At trial, Mr. Irving objected when the government asked Lt. Stark about his involvement in a prior drug-related investigation of Mr. Irving. During the ensuing bench conference, the government maintained that this evidence was "intrinsic" to the charged crime, arguing that it was necessary to explain how Mr. Irving became aware of Lt. Stark and what might have led him to solicit Lt. Stark's death at a party in 2006. R., Vol. II, at 243. The district court agreed that the testimonial evidence "is intrinsic," and overruled Mr. Irving's objection. *Id.* at 243–44. Lt. Stark then testified about his part in a 2005 controlled buy of crack cocaine involving Mr. Irving, and explained how it was at his behest that

_____

[23](...continued)
306 F.3d 1031, 1041 (10th Cir. 2002) ("Raising the issue for the first time at oral argument affords the defendant an inadequate opportunity to address it. It is unfair to lie in wait until oral argument to present issues material to the appeal."). Accordingly, we decline to address this contention.

Mr. Irving was eventually prosecuted as a result of the crime, despite problems with the cooperating witness.[24]

## A.    Standard of Review

Generally, we review a district court's decision to admit evidence for an abuse of discretion, and "we reverse a decision only if it is 'manifestly erroneous.'" *United States v. McPhilomy*, 270 F.3d 1302, 1312 (10th Cir. 2001) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 141–42 (1997)); *see also United States v. Batton*, 602 F.3d 1191, 1196 (10th Cir. 2010) ("Evidentiary rulings are reviewed for an abuse of discretion, which means we will not disturb the district court's ruling 'absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment.'" (quoting *United States v. Stiger*, 413 F.3d 1185, 1194 (10th Cir. 2005)). In particular, Mr. Irving contends that the district court erred in admitting Lt. Stark's testimony about the prior drug-related investigation under Federal Rule of Evidence 404(b), and our review of a district court's decision to admit evidence under this rule is likewise subject to an abuse-of-discretion

---

[24]    Federal prosecutors had not charged Mr. Irving after two years, presumably because the confidential informant used in the controlled buy was himself arrested in a controlled-buy situation at a later date. Lt. Stark nevertheless pushed forward with the prosecution, gaining permission from federal prosecutors to charge Mr. Irving in state court in 2007, because the officer felt that it was "a case that needed to be prosecuted and Ronald Irving was still a target in the Muskogee area for distributing large amounts of crack cocaine." R., Vol. II, at 248.

standard. *See United States v. Commanche*, 577 F.3d 1261, 1266 (10th Cir. 2009)

("We review the district court's decision to admit evidence under 404(b) for

abuse of discretion."); *accord United States v. Parker*, 553 F.3d 1309, 1313 (10th

Cir. 2009).

Under Rule 404(b),

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b).  In weighing the admissibility of evidence under this rule,

we consider four factors: "(1) whether the evidence is offered for a proper

purpose, (2) whether the evidence is relevant, (3) whether the probative value of

the evidence is substantially outweighed by its prejudicial effect, and (4) whether

a limiting instruction is given if the defendant so requests."  *Parker*, 553 F.3d at

1314.[25]  "The standard for satisfying Rule 404(b) admissibility is permissive: '[I]f

_____

[25]     Mr. Irving contests the applicability of this framework to his challenge, arguing that we have "not ma[d]e a blanket ruling on the use of prior bad acts under 404(b), but rather limited the use of this analysis to instances involving evidence of *prior uncharged misconduct*, or bad character evidence." Aplt. Reply Br. at 11 (internal quotation marks omitted).  Mr. Irving then distinguishes this case, noting that "Lt. Stark testified about prior *prosecutions* . . . , not uncharged crimes or mere bad character evidence."  *Id.* "This alone," he concludes, "should exclude the analysis submitted by the Government."  *Id.*  Mr. Irving, though, makes this argument without citation, and we find nothing in the case law that would support such a distinction.  *Cf. United States v. Lara*, 956 F.2d 994, 996–97 (10th Cir. 1992) (finding no abuse of

(continued...)

54

the other act evidence is relevant and tends to prove a material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403.'" *Id.* at 1314 (alteration in original) (quoting *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001)).

## B. Analysis

Mr. Irving contends that by permitting Lt. Stark to testify to the prior investigation and prosecution the district court "violated [his] right . . . not to have evidence of prior convictions presented to the jury." Aplt. Opening Br. at 35. He contends that "[t]he evidence . . . was not offered to prove any element of the crime, but operated to let the jury know that Mr. Irving was in jail on a prior drug charge." *Id.* at 36. Consequently, Mr. Irving asserts that it should have been excluded by the district court under Rule 404(b). In contrast, the government argues in part that the evidence of Mr. Irving's earlier prosecution and Lt. Stark's role in it was intrinsic to the charged crimes and therefore admissible despite Rule 404(b)'s general prohibition. *See* Aplee. Br. at 49 ("[T]he evidence of Appellant's 2005 drug conviction is *part of the scheme* for which Appellant is being prosecuted, because that is when his dealings with Lt. Stark began and

---

[25](...continued)
discretion in the district court's decision to admit evidence of a contemporaneous *prosecution* under the "other purpose" prong of Rule 404(b)). Moreover, Mr. Irving does not offer an alternative framework for us to apply.

55

when his motivation for killing him began to develop." (emphasis added)). The government has the better argument.

Rule 404(b) limits the admissibility of evidence related to "other crimes [or] wrongs," but it "only applies to evidence of acts extrinsic to the charged crime." *United States v. Pace*, 981 F.2d 1123, 1135 (10th Cir. 1992), *abrogated on other grounds as recognized in United States v. Bell*, 154 F.3d 1205, 1209–10 (10th Cir. 1998); *see also United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir. 1997) ("It is well settled that Rule 404(b) does not apply to other act evidence that is intrinsic to the crime charged."). If the contested evidence is intrinsic to the charged crime, then Rule 404(b) is not even applicable. *See O'Brien*, 131 F.3d at 1432. Of course, such evidence remains "subject to the requirement of [Federal Rule of Evidence] 403 that its probative value is not substantially outweighed by the danger of unfair prejudice." *United States v. Lambert*, 995 F.2d 1006, 1007–08 (10th Cir. 1993).

Mr. Irving insists that his prior prosecution "was entirely extrinsic," noting that "[t]he events were not temporally connected" to the crime being prosecuted and "were not related within any common scheme or plan." Aplt. Opening Br. at 35. In particular, he notes that "nothing Lt. Stark mentioned about the prior drug investigation established any element of the crime charged against [him] in this

56

matter," Aplt. Opening Br. at 36, which he seems to read as a requirement for evidence to be considered "intrinsic." His argument, however, is unavailing.[26]

We have held that "[o]ther act evidence is intrinsic"—and thus not subject to Rule 404(b)—"when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *Lambert*, 995 F.2d at 1007 (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)) (internal quotation marks omitted). We have never required that the other-act evidence establish an element of the charged offense. Rather, intrinsic evidence is that which is "directly connected to the factual circumstances of the crime and provides contextual or background information to the jury. Extrinsic evidence, on the other hand, is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense." *Parker*, 553 F.3d at 1314 (citation omitted) (quoting Thomas M. DiBiagio, *Intrinsic and Extrinsic Evidence in Federal Criminal Trials: Is the Admission of Collateral Other–Crimes Evidence Disconnected to the*

---

[26] Assuming, *arguendo*, that the evidence is intrinsic, Mr. Irving also challenges the scope of the evidence. More specifically, Mr. Irving contends that "[i]f at all intrinsic, the only relevant evidence would have been that Lt. Stark ha[d] investigated Mr. Irving for some offense which later resulted in a plea." Aplt. Opening Br. at 37. This, of course, ignores the multiple purposes for which the evidence was offered. For instance, although Mr. Irving is correct that an admission that Lt. Stark investigated Mr. Irving previously might have adequately addressed the issue of motivation, it would not have explained the plot's time line, which was another—and equally important—purpose behind the testimony.

*Fundamental Right to a Fair Trial*, 47 Syracuse L. Rev. 1229, 1231 (1997))

(internal quotation marks omitted). Thus, "evidence essential to the context of

the crime" is intrinsic and "does not fall under the other crimes limitation of Rule

404(b)." *Id.* at 1314–15.

In this case, Mr. Irving was charged with a drug offense arising from a

2008 transaction, and yet two witnesses testified that Mr. Irving had sought the

death of Lt. Stark as early as 2006. Without the proper context, this could have

created understandable confusion with the jury. The government sought to avoid

this by using Lt. Stark's testimony to both explain why Mr. Irving would have

wanted him killed in 2006 and to further illuminate Mr. Irving's "ongoing

motivation . . . to retaliate against Lt. Stark." Aplee. Br. at 46. Lt. Stark's

testimony "formed an 'integral and natural part of the witness[es]' accounts of the

circumstances surrounding the offense for which the defendant was indicted."

*United States v. Johnson*, 42 F.3d 1312, 1316 (10th Cir. 1994) (alteration omitted)

(quoting *United States v. Costa*, 691 F.2d 1358, 1361 (11th Cir. 1982)). It is

entirely germane background information, which is "directly connected to the

factual circumstances of the crime," *Parker*, 553 F.3d at 1314, and thus is

intrinsic to the crime at issue. Thus, Rule 404(b) is inapplicable.[27]

---

[27] Even if we deemed this evidence "extrinsic" and subject to Rule 404(b), it would nevertheless be admissible. Under Rule 404(b), evidence of other crimes or wrongs is admissible if introduced for a proper purpose, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or

(continued...)

58

Even though we conclude that the evidence is intrinsic—and therefore is not subject to the restrictions of Rule 404(b)—that does not end our inquiry. Such evidence may still be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; *see Lambert*, 995 F.2d at 1007–08. Mr. Irving maintains that Lt. Stark's evidence was "highly prejudicial" and therefore should have been excluded because it was not "probatively essential." Aplt. Opening Br. at 38. As an initial matter, we have never required that evidence be "probatively essential" to survive a prejudice inquiry under Rule 403. To the contrary, our law *favors* admission of all relevant evidence not otherwise proscribed; thus, exclusion under this rule is "an extraordinary remedy [that] should be used sparingly." *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999). The appropriate inquiry, then, is not whether the challenged evidence is *essential* to the case; instead, it is the one dictated by Rule 403 itself: whether the evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

---

[27](...continued)
absence of mistake or accident." Fed. R. Evid. 404(b). In this case, the evidence of the prior investigation by Lt. Stark was not offered "to prove the character of [Mr. Irving] in order to show action in conformity therewith," *id.*, but was instead offered for several proper purposes, including as motive for the charged witness-tampering offense, as clarification of the evidence concerning Mr. Irving's 2006 effort to find someone to kill Lt. Stark, and as an explanation of the plot's time line.

issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

We do not write on a blank slate, of course, when applying this test. We have previously noted that "[u]nfair prejudice in the Rule 403 context 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Tan*, 254 F.3d at 1211 (quoting Fed. R. Evid. 403 advisory committee's note). Moreover, we have explained:

> [U]nfair prejudice does more than damage the Defendant's position at trial. Indeed, relevant evidence of a crime which the government must introduce to prove its case is by its nature detrimental to a defendant who asserts that he is not guilty of the charged offense. In the Rule 403 context, however, "[e]vidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocen[c]e of the crime charged." Even if this type of prejudice is found, it must *substantially* outweigh the probative value of the evidence in order to be excluded under Rule 403.

*Id.* at 1211–12 (second alteration in original) (citation omitted) (quoting *Rodriguez*, 192 F.3d at 951).

In this case, we agree with the government that the district court did not abuse its discretion in determining that the challenged testimony would not result in unfair prejudice to Mr. Irving. "The trial court has broad discretion to determine whether prejudice inherent in otherwise relevant evidence outweighs its probative value." *Johnson*, 42 F.3d at 1315 (citing *United States v. Record*, 873

60

F.2d 1363, 1375 (10th Cir. 1989)).  Here, the trial court conducted the appropriate

weighing, and decided in favor of admission.  Moreover, it counter-balanced the

possible negative effects of admission by a limiting instruction, which

specifically directed the jury only to consider "evidence of other crimes, acts or

wrongs" insofar as it "bears on the defendants' motive, opportunity, intent,

preparation, plan, knowledge, identity, absence of mistake or accident and for no

other purpose."  R., Vol. I, at 103 (Jury Instructions, filed July 23, 2009).  And,

as the government has pointed out, we have upheld district court decisions

involving arguably more prejudicial revelations in the past.  *See, e.g.*, *United

States v. Ford*, 613 F.3d 1263, 1268 (10th Cir. 2010) (finding no unfair prejudice

where the district court admitted into evidence testimony regarding the fact that

the charged crimes were committed after the defendant had escaped from prison);

*United States v. Kimball*, 73 F.3d 269, 272 (10th Cir. 1995) (holding that the

probative value of evidence that defendant had recently been released from

prison, offered to show identity, opportunity, and motive, outweighed its

prejudicial effect in bank robbery prosecution).

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Mr. Irving's convictions.

61

10-7012 - *United States v. Irving*

**HARTZ**, Circuit Judge, concurring:


I join Judge Holmes's opinion.  I write separately only to suggest that the court should abandon the use of the intrinsic/extrinsic dichotomy in analyzing whether evidence of uncharged misconduct is admissible.  The notion of intrinsic evidence is helpful only in determining whether the government must give the defendant notice under Fed. R. Evid. 404(b) that it intends to offer the evidence.

Rule 404(b), as restyled (effective in December), states:

> **(b)** **Crimes, Wrongs, or Other Acts.**
> **(1)  Prohibited Uses.**  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> **(2) Permitted Uses; Notice in a Criminal Case.**  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  On request by a defendant in a criminal case, the prosecutor must:
> **(A)**  provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
> **(B)** do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

The concept of the rule is simple.  Uncharged misconduct (that is, "evidence of a crime, wrong, or other act") is inadmissible to the extent that it supports an inference that the defendant has a bad character and that he acted in conformity with that character in committing the charged offense.  At the same time, however, the uncharged misconduct may be admissible insofar as it is probative

of a matter relevant to the issues at trial (such as "motive, opportunity," etc.)  If it is probative on such a matter, the admissibility of the evidence depends on whether it passes muster under Fed. R. Evid. 403.  In particular, it is inadmissible if "its probative value is substantially outweighed by a danger of . . . unfair prejudice," Fed. R. Evid. 403 (2011), such as the danger that the evidence will be used for the bad-character purpose barred by Rule 404(b).

The intrinsic/extrinsic dichotomy does not assist in the analysis of admissibility.  Its supposed advantage is that once the uncharged misconduct is determined to be intrinsic to the charged offense, then evidence of the misconduct is not subject to Rule 404(b) and there is no need to analyze whether evidence of the misconduct is admissible for a proper purpose—such as notice.  But the advantage is illusory.  Even evidence of "intrinsic" misconduct will be inadmissible under Rule 403 if it has no proper probative value.  (I note that the evidence challenged on this appeal would undoubtedly be admissible even if it were considered evidence of "extrinsic misconduct."  *See* Op. at 57–58 n.26.)

Moreover, the problem is not just that the intrinsic/extrinsic dichotomy serves no useful function and consumes unnecessary attorney and judicial time and effort.  At least equally important, the distinction between intrinsic and extrinsic evidence is unclear and confusing, and can lead to substituting conclusions for analysis.  Others have written at length on this point, particularly the problems associated with saying that misconduct is intrinsic to the charged

crime if it is "inextricably intertwined with the crime"; so I will not rewalk that ground.  *See United States v. Gorman*, 613 F.3d 711, 719 (7th Cir. 2010) (abandoning inextricable-intertwinement test because is has "become overused, vague, and quite unhelpful"); *United States v. Green*, 617 F.3d 233, 248 (3d Cir. 2010) ("the inextricably intertwined test is vague, overbroad, and prone to abuse"); *United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000) ("[I]t is hard to see what function the [intrinsic/extrinsic] interpretation of Rule 404(b) performs."); *see generally* Saltzburg, Martin and Capra, Federal Rules of Evidence Manual, Paragraph 404.02[12] (10th ed. 2012) (discussing issue at length and concluding, "The 'inextricably intertwined' exception substitutes a careful analysis with boilerplate jargon.").

There is only one useful purpose for the intrinsic/extrinsic dichotomy in the Rule 404(b) context.  If the defendant in a criminal case so requests, the Rule requires the government to notify the defendant before offering evidence of uncharged misconduct.  *See* Rule 404(b)(2) ("On request by a defendant in a criminal case, the prosecutor must:  (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.").  Failure to give notice may result in exclusion of the misconduct evidence.  It seems to me that when the trial court is asked to exclude evidence on this ground, it can properly consider whether notice was not

-3-

necessary because the misconduct evidence was so closely tied to the evidence of the charged offense (that is, was "intrinsic" to the charged offense) that the defendant would expect it to be offered with the evidence of the charged offense. Of course, this (or any) definition of intrinsic still suffers from substantial ambiguity. But the clear purpose served by the term in this context—as shorthand that fairness did not require special notice that the evidence would be offered—will prevent the term from obscuring analysis. I think it not coincidental that the advisory committee's notes to Rule 404 use the terms *intrinsic* and *extrinsic* only in the note to the 1991 amendment to the Rule, which added the notice requirement.