FILED
United States Court of Appeals
Tenth Circuit

December 17, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

NATHAN ARCHULETA, a/k/a "Enemy",

Defendant-Appellant.

No. 12-2026

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 2:CR-09-02968-RB-6)**

---

Jill M. Wichlens, Assistant Federal Public Defender, (Warren R. Williamson, Federal Public Defender, Interim, with her on the briefs), Denver, Colorado, for Defendant-Appellant. Mark D'Antonio, Attorney at Law, Las Cruces, New Mexico, filed the initial brief for the Defendant-Appellant.

David N. Williams, Assistant United States Attorney (Kenneth J. Gonzales, United States Attorney, with him on the briefs), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **BRISCOE,** Chief Judge, **HOLLOWAY** and **HOLMES**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

A jury convicted Defendant Nathan Archuleta of possession of methamphetamine, possession of methamphetamine with intent to distribute, conspiracy to possess methamphetamine with intent to distribute, and being a felon in possession of a firearm. On appeal, Archuleta contends that admission of a gang expert's testimony violated Federal Rules of Evidence 403, 702, and 704(b). Of the three evidentiary rules now cited, only Rule 403 was raised by Archuleta before the district court. As a result, our review of his arguments pertaining to Rule 702 and Rule 704(b) is limited to plain error review. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

# I
## *Factual Background*

Archuleta was a leader of the Tortilla Flats gang in Farmington, New Mexico. The Tortilla Flats are an affiliate of the Sureños, a group of gangs with ties to the Mexican Mafia gang. In June 2009, Archuleta orchestrated a plan to smuggle methamphetamine from Mexico into the United States using two female accomplices as mules. The two females were Christine Roberts and Candi Ramirez. Also involved was Candi's brother, Adam Ramirez, a friend and lower-ranking "colleague" of Archuleta in the Tortilla Flats.

On July 2, 2009, the group put the plan into action. They drove from Albuquerque to Las Cruces, New Mexico, where they met with Daniel Muñoz, a

2

leader of a Las Cruces Sureño gang.  In Muñoz's apartment, Archuleta, Adam Ramirez, and Muñoz discussed their drug-smuggling scheme.  Roberts and Candi Ramirez were then dispatched to Mexico, along with their guide, Jose de la Luz Verdugo.  They drove Adam Ramirez's car across the border and picked up the drugs.  But on their way back, border patrol officers discovered the drugs and arrested the three of them.  Later, Adam Ramirez was arrested.  And after a few months on the lam, Archuleta, too, was arrested.  Three of Archuleta's coconspirators—Adam, Candi, and Christine Roberts—had turned on him, implicating him in the drug-smuggling scheme.

### *Procedural Background*

On July 22, 2010, a grand jury issued an eight-count superseding indictment charging Archuleta and Muñoz. Archuleta was charged with these six of the eight counts: (Count 1) conspiracy to possess 50 grams and more of methamphetamine with intent to distribute on July 2 and 3, 2009, in violation of 21 U.S.C. § 846; (Count 2) possession of 50 grams and more of methamphetamine with intent to distribute on July 2, 2009, in violation of 21 U.S.C. § 841; (Count 4) conspiracy to possess methamphetamine with intent to distribute from June 1, 2009, to November 5, 2009, in violation of 21 U.S.C. § 846; (Count 5) felon in possession of a firearm on November 5, 2009, in violation of 18 U.S.C. §§ 922, 924; (Count 6) carrying a firearm during the commission of count 4 conspiracy to possess, in violation of 18 U.S.C. § 924; and, (Count 7) possession of

3

methamphetamine on November 5, 2009, in violation of 21 U.S.C. § 844(a).

Before trial, Archuleta filed a motion in limine seeking to exclude gang-affiliation expert testimony. He argued that any expert testimony based on hearsay violated Crawford v. Washington, 541 U.S. 36 (2004), but conceded that "[t]he Government is free to seek to establish gang membership by non-hearsay evidence such as graffiti or tattoos." R. Vol. 1, at 20-21. Archuleta's motion also argued that gang experts generally had "no reliable data" on which to base their opinions. Id. at 22. He was careful to note, however, that he was not challenging "any part of the expert's opinion that may be based on the expert's own investigation or information from other law enforcement sources." Id. at 21 n.1.

A couple months later, the government filed notice that it would proffer Paul Lujan as an expert on gangs. Lujan was an officer with the gang unit of the Las Cruces, New Mexico Police Department, and the government stated that he would testify regarding the background, structure, and identifying tattoos of the Sureños. More generally, the government asserted that his testimony would assist the jury in understanding the relationships of the parties and in determining the existence of a conspiracy.

The district court held the first of two expert witness hearings on August 3, 2010, during which Lujan testified as to his credentials. The court was satisfied that Lujan had specialized knowledge of the Sureños, and concluded sufficient foundation had been laid to permit him to testify as an expert. But the court was

4

uncertain whether the danger of unfair prejudice from Lujan's testimony substantially outweighed its probative value. And so the government was ordered to produce additional material for the court's review.

The second hearing was held two days later. After reviewing additional evidence on the connection between the Sureños and the charged crimes, the district court concluded that the "Sureño affiliation, association, is significant in terms of the . . . conspiracy," because witnesses would testify that Archuleta was a "high-ranking member[] of the gang." R. Vol. 3, pt. 13, at 2001-02. Accordingly, the court ruled that Lujan could testify "about the Sureños, the significance of the tattoos, the Tortilla Flats thing, all of that, as it relates to the July 2[] incident." Id. at 2002. Archuleta objected to Lujan's testimony as irrelevant and prejudicial, and the court overruled his objection.

At trial, Archuleta again objected, insisting that Lujan did not qualify as a gang expert and that gang testimony was irrelevant. Again, the district court overruled the objection. Lujan proceeded to testify about the Sureños' history, colors, tattoos, structure, activities, and affiliation with the Mexican Mafia. When shown photographs of Archuleta's tattoos, Lujan testified that those tattoos identified the person in the photographs as a member of the Tortilla Flats Sureño gang.

On August 16, 2010, after a six-day trial, the jury found Archuleta guilty of counts 1, 2, 5, and 7, and not guilty of counts 4 and 6. On January 12, 2012, the

5

court sentenced Archuleta to 360 months' imprisonment on counts 1 and 2, 120 months' imprisonment on count 5, and 12 months' imprisonment on count 7. All sentences were to be served concurrently.

## II

On appeal, Archuleta contends that admission of Lujan's testimony violated Federal Rules of Evidence 403, 702, and 704(b).

### *Rule 403*

Archuleta argues that Lujan's testimony was needlessly cumulative, confusing, misleading, and unfairly prejudicial. Generally, relevant evidence is admissible at trial. Fed. R. Evid. 402. Rule 403, however, permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. We review for abuse of discretion a properly-preserved Rule 403 objection to the district court's decision to admit evidence. United States v. McGlothin, 705 F.3d 1254, 1260 (10th Cir. 2013). "Our abuse of discretion review affords the district court considerable discretion in performing the Rule 403 balancing test because district court judges have front-row seats during trial and extensive experience ruling on evidentiary issues." United States v. MacKay, 715 F.3d 807, 839 (10th Cir. 2013) (internal quotation marks omitted).

6

First, Archuleta argues that Lujan's testimony was needlessly cumulative because Adam Ramirez's testimony covered the same information. During his testimony, Adam Ramirez described the Sureños' tattoos, structure, and purpose, as well as Archuleta's involvement in the Tortilla Flats. To be sure, Lujan covered some of the same ground. But not only did Lujan provide more detail than Adam Ramirez did on several subjects, Lujan also testified about subjects Adam Ramirez never mentioned, like the Sureños' origins and history. Simply put, Lujan's testimony was not a total repeat of Adam Ramirez's testimony, and Archuleta does not explain how its admission was an abuse of discretion on this ground. See United States v. Edwards, 540 F.3d 1156, 1162-63 (10th Cir. 2008) (holding that five recordings of emergency 911 calls were not cumulative evidence). Thus, we conclude that the district court did not abuse its discretion in refusing to exclude Lujan's testimony as cumulative.

Second, Archuleta insists that Lujan's testimony was confusing and misleading. According to him, the history of the Sureños had "little or nothing to do" with his charges, and that the testimony "suggest[ed] to the jury that the drug-smuggling scheme was somehow in fact linked to the Mexican Mafia." Aplt. Br. at 26-27. We disagree. As we explain in more detail below, Archuleta was in a Sureño gang, therefore testimony concerning the Sureños' origins and activities was relevant in explaining Archuleta's activities as a member and, indeed, as a leader. And there was a low risk that such straightforward testimony would

7

mislead the jury into thinking that Archuleta acted on behalf of the Mexican Mafia. This risk did not substantially outweigh the testimony's probative value, and thus, the district court did not abuse its discretion in rejecting Archuleta's assertion that Lujan's testimony was confusing and misleading.

Finally, Archuleta's main focus and concern is whether he was unfairly prejudiced by the admission of Lujan's testimony. As we have explained, unfair prejudice must do more than simply harm a defendant's case. United States v. Irving, 665 F.3d 1184, 1213-14 (10th Cir. 2011). Virtually all relevant evidence is prejudicial to one side or the other. Evidence becomes *unfairly* prejudicial, however, when it "makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." Id. (alterations omitted) (internal quotation marks omitted). But even where unfair prejudice is found, "it must substantially outweigh the probative value of the evidence in order to be excluded under Rule 403." Id. at 1214 (emphasis omitted).

According to Archuleta, Lujan's "repeated references to drive-by shootings, kidnappings, and stabbings allegedly committed by unnamed Sureños, and to the general crime wave in Las Cruces the gang had caused" were unfairly prejudicial. Aplt. Br. at 26. The dissent agrees that unfair prejudice was likely, noting Lujan's "lurid snapshot of the history and habits of the Sureños," as well as his

8

"repetitive references to home invasions, drive-by shootings, kidnappings, burglaries, and beatings allegedly committed by them." Dissent at 4. According to the dissent, none of this "information was [] in any way useful in helping the jury understand the other testimony in the case or in determining the facts at issue." Id. The dissent also finds objectionable Lujan's description of the Sureños' "violent initiation ceremonies" and "draconian methods of imposing internal order and discipline among their membership," concluding that "[n]ot a word of this line of testimony was probative of anything at issue in Mr. Archuleta's trial." Id. at 6. It appears that the dissent urges not only that Lujan's testimony was unfairly prejudicial, but also that it was irrelevant.

We disagree that Lujan's testimony was irrelevant. At the outset, we note that we have ruled in prior cases where conspiracy is charged that gang-affiliation testimony may be relevant. See, e.g., United States v. Brown, 200 F.3d 700, 708 (10th Cir. 1999) (allowing gang-affiliation evidence as evidence of conspiracy); United States v. Sloan, 65 F.3d 149, 151 (10th Cir. 1995) (permitting use of "gang activity" evidence "to prove the existence of a conspiracy and to show the basis of the relationship between the defendant and witnesses who participated in the drug distribution operation"); United States v. Robinson, 978 F.2d 1554, 1564 (10th Cir. 1992) (affirming admission of gang-expert testimony because "associational evidence may be directly relevant on the issues of formation, agreement and purpose of a conspiracy"); United States v. Silverstein, 737 F.2d

9

864, 866 (10th Cir. 1984) (allowing gang-affiliation testimony when defendant was affiliated with Aryan Brotherhood).

More to the point, though, a pillar of the defense's case was testimony designed to negate the image of Archuleta as a gang leader capable of commanding subordinates, and instead to paint the Tortilla Flats as "just a group of friends" who only got together to "hang out." See, e.g., Trial Tr. Vol V, at 135, 137. For example, the defense put Alex Wenger on the stand to testify about his time as a member of the Tortilla Flats, and he testified that there were no "mandatory meetings," "[n]obody organized anything," and "[n]obody told [people what] to do or anything like that"; this Sureño gang was "just a group that gets together, plays video games and drinks beer." Id. at 135, 139. When asked about the gang's "hierarchy," he testified that "there were no leaders in th[e] gang, [and] everyone was equal." Id. at 142. Indeed, Wenger testified that if Archuleta ever "told [him] to do something," he would not "automatically do it," and that Archuleta never "threatened to kill [him] or to beat [him] if [he] didn't follow his direct order." Id. at 136.

When Archuleta took the stand, he echoed the same theme. He testified that the Tortilla Flats imposed "no obligations" on its members, explaining that "it's not like [a member] can't move away or . . . can't go do what [he] want[s] to do . . . . That's not the purpose of the gang, to control or to do anything like that. . . . I considered it more like a family." Id. at 163. In fact, he testified that the

10

gang "never did anything to make money together." Id. at 263. And on the issue of his authority in the gang, he testified that "[w]e don't really have no roles or anything like that," and that "[n]obody is greater than the next person." Id. at 231-32; see also Trial Tr. Vol. VI, at 12 ("There's no rank or regulations or anything like that for any of us.").

The implication of this testimony and of the defense's case-in-chief was unmistakable: Although Archuleta's alleged coconspirators *claimed* that their crimes on July 2 were the product of their fearful submission to Archuleta's commands and implicit threats, in fact those alleged coconspirators were always free to do as they wished, and so they must have acted on their own initiative in this case as well. Indeed, if the Tortilla Flats were "just a group that gets together, plays video games and drinks beer," then it would be unlikely that Archuleta would have known that his companions intended to smuggle drugs across the border.

The prosecution offered two logical, relevant counters to the image of Archuleta and his Sureño gang as portrayed by the defense. First, the prosecution presented testimony from the coconspirators characterizing Archuleta as a threatening authority figure who orchestrated the drug smuggling scheme. Second, the prosecution presented testimony from Lujan describing the typical Sureño gang as operating with a rigid hierarchy, in which leaders give orders to engage in illegal activity and, under threat of violence, subordinates obey those

11

orders. The logic behind offering Lujan's testimony was simple: If the coconspirators' description of the events leading up to and on July 2 is consistent with the typical operation of a Sureño gang, then it is more likely that the coconspirators testified truthfully. And so, Lujan's testimony was directly relevant to evaluating critical testimony regarding the relationship of the parties, and the genesis, terms, and purpose of the conspiracy.

More plausible is the contention that Lujan's testimony was unfairly prejudicial. The dissent points to passages of Lujan's testimony in which he listed a series of crimes allegedly committed by Sureños, including "home invasions, drive-by shootings, burglaries, and beatings," Dissent at 4, as well as the Sureños' "violent initiation ceremonies," "draconian methods of imposing internal order and discipline among their membership," and "ruthlessness in dealing with informants," id. at 6. The unfair prejudice from this testimony, according to Archuleta and the dissent, substantially outweighed the testimony's probative value.[1]

When viewed in context, however, we are unpersuaded that the district court abused its discretion in refusing to exclude Lujan's testimony as unfairly

---

[1] The cases cited by Archuleta on this point are all inapposite. See, e.g., United States v. McRae, 702 F.3d 806, 823, 828 (5th Cir. 2012) (holding that a defendant should have been tried separately when there was no evidence that he was "in any way associated with the acts of his co-defendant[s]"); United States v. Parker, 71 M.J. 594, 610-11 (N-M. Ct. Crim. App. 2012) (holding that evidence of defendant's prior bad acts were improperly admitted under Rule 404(b)).

12

prejudicial. Any unfairness from gang-affiliation testimony stems from the implicit connection the expert draws between the crimes committed by gangs and the defendant gang member. In most cases, concern about such innuendo would be proper, because ordinarily the jury should not assume that the defendant gang member committed the crimes detailed by the expert. Here, however, Archuleta took the stand and catalogued his personal involvement in virtually every crime the dissent lists. During his testimony, Archuleta admitted that he had broken into a home and robbed it, that he and the Tortilla Flats were involved in attacks, shootings, and other crimes, that he had stolen a car while armed with multiple guns and knives, that he had physically assaulted both police officers and private citizens, and that he had been involved in many violent initiation ceremonies. Thus, to the extent there is a concern that the jury might have heard Lujan's testimony and linked Archuleta to those crimes, we think that Archuleta pretty well took care of that himself.

Even so, the dissent insists, Lujan's testimony prejudiced Archuleta by so harming Archuleta's moral standing in the jury's eyes that the jury convicted him for being a bad person. Unlike the dissent, however, we are dubious that the jury's regard for Archuleta was susceptible of decrease. Even putting aside the hours of damning testimony from his coconspirators, Archuleta made a remarkable series of admissions during his own testimony. In addition to taking credit for the crimes we have already listed, Archuleta described *himself* as a

13

habitual drug-using felon who had repeatedly violated his parole, been on the run from the police on multiple occasions, stolen deadly weapons from a home, been a womanizer who "didn't care . . . about [his sexual partner's] feelings, whatsoever," Trial Tr. Vol VI, at 59, zip-tied a woman's hands and feet behind her, spit at a police officer while so drunk and disorderly as to require mace to be subdued, run over a dog during a high-speed chase, threatened to murder a host of police officers, and, when asked whether he had ever used throwing knives or throwing stars against another human being, answered "[n]o," because "they're not going to stick real good in anybody." Trial Tr. Vol V, at 213.

And in spite of all this testimony, during which Archuleta meticulously assassinated his own character, the jury *still* parsed the conspiracy charges, finding Archuleta guilty on count 1 but not guilty on count 4. In the end, the jury's verdict appears to be based on reason, rather than emotion. Therefore, even if the district court abused its discretion in admitting Lujan's testimony, we are convinced that the error was harmless. See United States v. Resendiz-Patino, 420 F.3d 1177, 1181 (10th Cir. 2005) ("A harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect."). The independent evidence of both the gang's activities and Archuleta's involvement in the gang was overwhelming. When the trial testimony is reviewed as a whole, Lujan's testimony did not have a substantial influence on the outcome of the trial.

14

*Rule 702*

Archuleta argues that "the operation of the Sureños gang was not so complicated that the jury needed an expert's help to understand it. . . . Adam Ramirez's testimony about the gang was sufficient." Aplt. Br. at 27. Rule 702 requires a district court to "satisfy itself that the proposed expert testimony . . . will assist the trier of fact, before permitting a jury to assess such testimony." United States v. Rodriguez-Felix, 450 F.3d 1117, 1122 (10th Cir. 2006). To determine whether the testimony will assist the trier of fact, courts look to "whether the testimony is relevant," "within the juror's common knowledge and experience," and "whether it will usurp the juror's role of evaluating a witness's credibility." Id. at 1123. Because Archuleta failed to raise this Rule 702 argument at trial, we review it now for plain error. See United States v. Garza, 566 F.3d 1194, 1200 (10th Cir. 2009) ("[T]o preserve [a] claim of error, [a] party must object with specificity, articulating the precise ground for the objection." (internal quotation marks omitted) (citing United States v. Winder, 557 F.3d 1129, 1136 (10th Cir. 2009))). "Under the rigorous plain-error standard, a defendant has the burden of showing (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights." United States v. Begaye, 635 F.3d 456, 470 (10th Cir. 2011) (internal quotation marks omitted). "If he satisfies these criteria, this Court may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation

of judicial proceedings." Id. (internal quotation marks omitted).

As we discussed earlier, Lujan covered many of the same subjects as did Adam Ramirez. But there were also differences. Unlike Adam Ramirez, Lujan testified about the broader context of the Sureños, including their origins and history. He even added details about the structure, purpose, and activities of the Sureños that Adam Ramirez never mentioned. The average juror is unlikely to be aware of those facts. See United States v. Garcia, 635 F.3d 472, 477 (10th Cir. 2011) (affirming admission of expert testimony about firearm straw purchases because "[t]he average juror is as likely to be unaware of the dynamics of the illicit arms trade as of the trade in narcotics"). The evidence was relevant because Archuleta and two of his coconspirators were members of a Sureño gang, making such evidence probative of Archuleta's conduct. And we have affirmed district courts' admission of gang-expert testimony as helpful to a jury when a defendant is a gang member. See Robinson, 978 F.3d at 1564.

At bottom, Archuleta simply fails to explain how relevant evidence, which no other witness covered, was unhelpful to the jury's understanding of the implications of his membership in the Tortilla Flats. See 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6265, at 250 (1997) ("[T]he 'assist' requirement is satisfied where expert testimony advances the trier of fact's understanding to any degree."). When Rule 702 is applied in the context of this trial, the district court did not commit plain error in admitting

16

Lujan's testimony to assist the jury in understanding the operation of a Sureño gang.

### *Rule 704(b)*

Archuleta's final argument is that Lujan's testimony violated Rule 704(b) because it "was the functional equivalent of an opinion that Mr. Archuleta in fact had knowledge of the smuggling scheme." Aplt. Br. at 28-29. Under Rule 704(b), "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). We have interpreted the Rule as "prevent[ing] experts from expressly stating the final conclusion or inference as to a defendant's mental state," but "not prevent[ing] the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state." United States v. Goodman, 633 F.3d 963, 970 (10th Cir. 2011) (internal quotation marks omitted). In short, the question is whether Lujan improperly testified about Archuleta's mental state. Because Archuleta failed to object at trial regarding any alleged violation of Rule 704(b), we review this issue for plain error.

Archuleta points to the following testimony from Lujan as violative of Rule 704(b):

> Q. [I]s it possible for a lower ranking soldier, depending on the circumstances, to go ahead and jump a capitán? In other words, in order to leap over him and broker the soldier's own drug deal without

17

capitán knowing?

A. No, there's not. There's no way. If something like that would happen, there would be severe penalties.

Q. Could it happen?

A. It could happen, yes. But if the higher person found out about it, again there -- the repercussions of that would come back.

Q. And if you altered it a little bit and I said, well, not just in any circumstance, but let's say that there were two capitans [*sic*] in a tiny apartment and a soldier as well, do you think it would be possible in that situation for the soldier to broker a deal without the capitán knowing?

A. No, because I think the intimidation factor is there already. You have two leaders and somebody that's lower ranking that's not going to jump ship to go broker or something -- do something on his own without approval from his superiors.

R. Vol. 3, pt. 10, at 1461-62. Archuleta asserts that through this testimony "the government did indirectly what it was prohibited from doing directly." Aplt. Br. at 29. Put another way, he contends that the government cloaked in hypothetical the question of whether Archuleta had knowledge of the drug-smuggling conspiracy.

He has a point. An expert could properly testify to "facts or opinions from which the jury could conclude or infer" that Archuleta had knowledge of the conspiracy, see Goodman, 633 F.3d at 970, but that final inference is "for the trier of fact alone," see Fed. R. Evid. 704(b). Lujan's response to the hypothetical question posed probably crossed that line. The "altered" second hypothetical

18

involved the same facts as in Archuleta's case, and directly posed the question of whether a person in Archuleta's position could lack the requisite mens rea. Lujan definitively answered "No."

Even if Lujan's testimony violated Rule 704(b), however, Archuleta cannot demonstrate plain error. This demanding standard requires him to show, among other things, "that the error must have affected the outcome of the district court's proceedings." United States v. Pablo, 696 F.3d 1280, 1293 (10th Cir. 2012) (internal quotation marks omitted). But three of his coconspirators testified that Archuleta not only participated in the smuggling scheme but also orchestrated it.

For example, Roberts testified to the following facts. At some point prior to the trip to Las Cruces, Archuleta alerted her to the possibility that they would "go[] to Las Cruces and bring[] drugs back to Albuquerque." R. Vol. 3, pt. 2, at 166. When the day of the trip came, and Archuleta drove over to pick her up, he asked her, "Are you ready? We're going to Las Cruces. We're all about to get paid." Id. at 167-68. When they arrived at Muñoz's apartment in Las Cruces, Archuleta and Muñoz met privately in a closed bathroom. When Archuleta came out, he told Roberts and Candi Ramirez that they must go to Mexico, and instructed them to "vacuum out the car very well" so that if, at "the checkpoint, a dog were to come and smell the car, [no] little weed stem or anything . . . would . . . attract [the] dog to the car." Id. at 179-80, 183. Archuleta explained that he was sending Roberts and Candi Ramirez to Mexico because "it would look less

19

suspicious if two females go." Id. at 181-82. "[T]errified for [her] life," Roberts complied. Id. at 181. During the drive, Roberts and Candi Ramirez were instructed by phone to "go to the movie theater in Deming to meet this person." Id. at 188. They did so, and there they picked up their guide, Jose de la Luz Verdugo. They knew they were going to transport methamphetamine because they "were told by [Archuleta] that that's what [they] were picking up." Id. at 197. In short, Roberts testified that Archuleta had given the commands and that he had planned how the drug smuggling would take place. See, e.g., R. Vol. 3, pt. 3, at 251 (Roberts agreeing that "Archuleta planned the deal").

For his part, Adam Ramirez expanded upon the extent to which Archuleta had played a primary role in orchestrating the plan. When Adam Ramirez learned that Archuleta had ordered Adam's sister, Candi, "to go pick up drugs in Las Cruces," Adam voiced his objection to Archuleta, and said, "I don't want nothing to do with it." Id. at 349-51. But the decision was not Adam's to make, rather it was Archuleta's, who told Adam that his involvement was required. In Muñoz's apartment, Archuleta and Muñoz had an argument about who was supposed to provide the vehicle for the drug smuggling. Archuleta told Muñoz, "I bring the girls. . . . [Y]ou're supposed to supply the ride." Id. at 360. And then Archuleta resolved the issue by telling Adam, "Let us use your ride." Id. at 361. Reluctantly, Adam consented. Echoing what Roberts had said, Adam Ramirez described Archuleta as a leader of the conspiracy.

20

Likewise, Adam's sister, Candi Ramirez, testified that Archuleta was central to the creation and oversight of the smuggling scheme. On the morning of the day they all drove to Las Cruces, Archuleta was at Candi's house. It was there that Archuleta asked Candi to "go down there and bring [drugs] back for him." R. Vol. 3, pt. 4, at 475-76. At the time, Candi thought Archuleta wanted her to carry drugs from Las Cruces. Id. at 485. On the drive to Las Cruces, Adam drove, and Archuleta "would tell Adam where to go." Id. at 482. And in Muñoz's apartment, after Archuleta told Roberts and Candi to go to Mexico to pick up the drugs, he gave them money for gas, and told them to vacuum the car in order to avoid problems at the checkpoint. Id. at 485-86, 489.

All three of these coconspirators testified to Archuleta's key role in the planning and execution of the conspiracy. Thus, even in the absence of the challenged response by Lujan to the hypothetical question, there was more than sufficient evidence presented to establish that Archuleta had knowledge, and in fact was key in the organization, of the drug-smuggling scheme. Archuleta has not shown how this testimony affected his substantial rights, and reversal on these grounds is not warranted under plain error review.

AFFIRMED.

21

No. 12-2026, *United States v. Archuleta*

**HOLLOWAY**, Circuit Judge, dissenting.

I cannot join my colleagues in affirming Nathan Archuleta's convictions on the two counts relating to an alleged July 2009 conspiracy to possess and distribute methamphetamine.[1] My firm belief that the district court erred in admitting significant portions of Officer Paul Lujan's "gang expert" testimony compels me to dissent. Much of the challenged testimony was irrelevant and inflammatory. It misled the jury. It prejudiced Mr. Archuleta's defense. And it had no place at trial—at least not in a fair one. Today's majority now compounds the district court's errors by accepting the violations of the Federal Rules of Evidence.

<u>Mr. Archuleta and Federal Rule of Evidence 403</u>

Mr. Archuleta, a member of a gang known as the Sureños, stood accused of conspiring to possess and distribute a sizeable amount of methamphetamine. The fact of Mr. Archuleta's longstanding affiliation with the Sureños was never at issue in this case. Likewise, there was no dispute whatsoever that he knew and associated with the other

---

[1] Mr. Archuleta was charged by a grand jury with six felony counts, two of which related to the alleged July 2009 conspiracy. Count 1 charged that, on July 2 and 3, 2009, Mr. Archuleta conspired to possess, with the intent to distribute, 50 grams and more of methamphetamine, in violation of 21 U.S.C. § 846. Count 2 charged Mr. Archuleta with possession of 50 grams and more of methamphetamine with intent to distribute on July 2, 2009, in violation of 21 U.S.C. § 841. Mr. Archuleta was acquitted of two additional charges, contained in Counts 4 and 6 of the indictment. Finally, he was found guilty on Counts 5 and 7, which involved firearms and drug-possession charges relating to his November 2009 arrest following a high-speed chase. I would reverse Mr. Archuleta's convictions on Counts 1 and 2—the charges stemming from the alleged July 2009 conspiracy.

principals in the alleged drug-smuggling conspiracy—Adam Ramirez, Candi Ramirez, and Christine Roberts—each of whom testified against Mr. Archuleta at trial. The government's case should properly have been left to rise or fall on the testimony of these self-confessed coconspirators and the admissions of Mr. Archuleta, leaving the jury to weigh the credibility of the government's cooperating witnesses against that of Mr. Archuleta and the version of events presented in his own defense.

In appropriate circumstances, evidence of gang affiliation and gang activity may, of course, be admitted to prove a conspiracy or to "'show the basis of the relationship between the defendant and witnesses.'" *United States v. Brown*, 200 F.3d 700, 708 (10th Cir. 1999) (quoting *United States v. Sloan*, 65 F.3d 149, 151 (10th Cir. 1995)); *see also United States v. Robinson*, 978 F.2d 1554, 1562 (10th Cir. 1992) (stating that "associational evidence may be directly relevant on the issues of formation, agreement and purpose of a conspiracy"). But those proper aims were not really achieved here, for Officer Lujan's testimony had very little to do with either Mr. Archuleta or his relationship with the Ramirez siblings and Ms. Roberts—again, a relationship that did not need to be explored or explained through expert testimony because the involved parties had already testified about it themselves at length.

Rather, Officer Lujan's testimony had much to do with creating an aura of fear and mistrust around Mr. Archuleta—not Mr. Archuleta the individual defendant, but Mr. Archuleta the Sureño. Officer Lujan, in effect, told the jury over and over that the Sureños were evil men who did evil things. The great risk of such testimony is that, in the eyes of the jurors, Mr. Archuleta would cease to be seen as one person, charged with

discrete criminal acts, but entitled to a presumption of innocence and a fair trial. Instead, he would be viewed only as a dangerous member of a dangerous group, one who is certainly capable (and quite possibly guilty) of committing *any* of the criminal activities and antisocial behaviors ascribed to the organization—not least of all the particular crime charged.

The inclusion of Officer Lujan's gratuitous testimony about the Sureños offended both the letter and spirit of Federal Rule of Evidence 403, which allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." As for the challenged testimony, the majority concedes that "[i]n most cases, concern about such innuendo would be proper." Maj. Op. at 13. Nevertheless, the majority goes on to conclude that Officer Lujan's testimony was not unfairly prejudicial and that "even if the district court abused its discretion in admitting Lujan's testimony, . . . the error was harmless." *Id*. at 14.

I do not agree. In my view, this was error that requires reversal, particularly when the clearly established burden of the government to show that the errors were harmless is taken into account. "The burden of proving the error is harmless is on 'the beneficiary of the error.'" *United States v. Montgomery*, 439 F.3d 1260, 1263 (10th Cir. 2006) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also United States v. Glover*, 413 F.3d 1206, 1210 (10th Cir. 2005) ("In non-constitutional harmless error cases, the government bears the burden of demonstrating, by a preponderance of the evidence, that

the substantial rights of the defendant were not affected.") (citing *Williams v. United States*, 503 U.S. 193, 203 (1992)). Here, the majority has effectively relieved the government of any such burden.

Officer Lujan's Testimony

Officer Lujan had much to say to the jury. The transcript of his testimony spans fifty-one pages in the record. Through him, the jury was treated to an introductory course on the foundational history of the Sureños while simultaneously being schooled in the arcana of the gang's symbols, tattoos, and initiation rituals. And Officer Lujan did not limit himself merely to providing a lurid snapshot of the history and habits of the Sureños. He also peppered his testimony with repetitive references to home invasions, drive-by shootings, kidnappings, burglaries, and beatings allegedly committed by them. The government does not convincingly explain why any of this information was actually relevant to proving Mr. Archuleta's participation in a single plan to smuggle drugs on a single day in 2009—nor can it, because the information was not in any way useful in helping the jury understand the other testimony in the case or in determining the facts at issue.[2]

---

[2] The majority appears to urge that this lengthy recitation by Officer Lujan was necessary to show that Mr. Archuleta was a "threatening authority figure" within "a rigid hierarchy," Maj. Op. at 11, whose implacable control over his alleged coconspirators was cemented by violence or the imminent threat of violence, either at the hands of Mr. Archuleta individually or the Sureños at large. According to Officer Lujan and the majority, Mr. Archuleta's power over his confederates was wholly derived from his high-ranking status within the Sureños, and thus it was important to lay out the entirety of the gang's violent saga for the jury in order to explain the source of his ability to dragoon others into doing his criminal bidding.
(continued . . .)

-4-

Officer Lujan's testimony is worth a close look. Mr. Archuleta's trial took place in Las Cruces, Doña Ana County, New Mexico. The pool of jurors was drawn from that vicinity. Officer Lujan informed the jurors that the Doña Ana County area had seen "a spike in gang violence" and that "[t]he crime that we were having . . . was primarily gang-related." R. Vol. 3, pt. 10, at 1453. When Officer Lujan spoke of gangs and gang violence, he was specifically referring to the Sureños. He stated that "[w]e've had numerous drive-by shootings." *Id.* And he spelled out other particulars "of all the crime that we're having" for the jury, as well: "The home invasions, the narcotics, the burglaries, the auto burglaries . . . ." *Id.* A little later on, Officer Lujan again reminded the jury of "the drive-by shootings and home invasion and so forth." *Id.* at 1454. And,

This strikes me as wrong for two reasons. To begin with, Officer Lujan's testimony, in both its detail and scope, went far beyond merely providing relevant associational evidence tending to show a relationship among the alleged coconspirators. As noted above, gang-affiliation testimony *may* be relevant in explicating the "formation, agreement and purpose of a conspiracy." *Robinson*, 978 F.2d at 1562. It may also "show the basis of the relationship between the defendant and witnesses." *Sloan*, 65 F.3d at 151. Had Officer Lujan limited his testimony to those well-defined purposes, the testimony likely would have been properly admissible. But Officer Lujan did not give a straightforward description of Mr. Archuleta's interactions with Ms. Roberts and the Ramirez siblings, as viewed in the context of his Sureño affiliation. His testimony more closely resembled a baroque narrative of Sureño violence and depredation. As such, it exceeded the limits of relevance.

Second, it is not insignificant that two of the three testifying coconspirators, Ms. Roberts and Ms. Ramirez, were not members of the Sureños at all. Ms. Roberts was a sometime lover of Mr. Archuleta's, and Ms. Ramirez was Mr. Ramirez's sister. For this reason, it would seem that extensive testimony about life *as a member of the Sureños*, with its attendant obligation of unquestioning loyalty to one's Sureño leaders, would be of limited utility at best in describing their relationship to Mr. Archuleta. It is one thing for Ms. Roberts or Ms. Ramirez to testify that they were well-acquainted with Mr. Archuleta, and that they were frightened or intimidated by him. It is quite another matter to attempt to ground their apprehension, as did the government, in tales of the Mexican Mafia, gangland initiations, or crime waves in Las Cruces.

after describing the extensive reach of the Sureños in southern New Mexico and beyond, he returned to the theme of Sureños "doing home invasions, doing drug rips, auto burglaries, anything criminal." *Id.* at 1456. And yet again: "drive-bys, shootings." *Id.* at 1459.

Officer Lujan also spoke at length about the Sureños' connections to the Mexican Mafia and their extensive networks both within and outside of the prison system. *See id.* at 1451-52. He described the Sureños' violent initiation ceremonies. *See id.* at 1457. He discussed their draconian methods of imposing internal order and discipline among their membership, noting that a disobedient Sureño is "going to get dealt with, either assaulted pretty bad, beat, stabbed, shot, kidnapped." *Id.* at 1460. As for a Sureño who chooses to leave the gang, "They're going to get beat. They're going to get dealt with. They're going to get physically assaulted every single time because they left their gang." *Id.* at 1458. In a similar vein, he told of their ruthlessness in dealing with informants, who the jury was told are subjected to "severe beatings, assaults," *id.* at 1460, and who will "get shot, dealt with, kidnapped, taken across the border," *id.* at 1461.

Not a word of this line of testimony was probative of anything at issue in Mr. Archuleta's trial, and none of it should have been allowed to come in. The majority makes much of the fact that Mr. Archuleta himself frankly admitted that he was, in essence, a criminal with a long history of bad acts, bad decisions, and bad associations. Indeed, the majority appears to hold Mr. Archuleta's candor against him. *See* Maj. Op. at 13 (opining that "to the extent there is a concern that the jury might have heard Lujan's testimony and linked Archuleta to those crimes, we think that Archuleta pretty well took

-6-

care of that himself" and that "we are dubious that the jury's regard for Archuleta was susceptible of decrease"); *id.* at 14 (observing that Mr. Archuleta "meticulously assassinated his own character"). The majority misses the point.

Contrary to the majority's suggestion, my reason for dissenting in this case has nothing to do with safeguarding Mr. Archuleta's "moral standing," *see id.* at 13, in the eyes of the jurors or, for that matter, anyone else. My concern is with *fairness*: the fundamental guarantee to which Mr. Archuleta, as a criminal defendant, is entitled. Mr. Archuleta may mistreat women, hurt dogs, and threaten police officers. He may habitually abuse alcohol and illegal drugs. He may be aggressive, callous, sometimes violent, and in no way a productive member of society. But Mr. Archuleta was not on trial for those things, and, just as surely, none of them is relevant to proving the existence of a conspiracy in this case.[3]

---

[3] The majority also overemphasizes the fact that Mr. Archuleta was acquitted by the jury on two of the conspiracy counts against him. Those counts related to an allegedly further-reaching drug conspiracy spanning from July 2009 to November 5 of that year, when Mr. Archuleta was arrested. It appears that the parties involved with, and the facts and evidence underlying, this alleged conspiracy substantially differed from those surrounding the alleged conspiracy of July 2 and 3, 2009. The majority never describes the evidence supporting the purported July–November 2009 conspiracy, or the lack of such evidence, as is perhaps the more likely situation. To be sure, a case might be so flimsy that even a barrage of unfairly prejudicial testimony cannot distract a jury from the essential weakness of the charges.

The charges relating to the alleged conspiracy of July 2 and 3, 2009 are entirely another matter. The testimony of Ms. Roberts and the Ramirez siblings dealt directly—and extensively—with Mr. Archuleta's participation in that alleged July 2009 conspiracy, for which he was ultimately convicted on Counts 1 and 2. By introducing Officer Lujan's prejudicial testimony, the government placed a heavy thumb on the scales that balanced the testimony of those cooperating witnesses with Mr. Archuleta's conflicting account of the events that took place on July 2 and 3, 2009. And that is the (continued . . .)

The difference between Mr. Archuleta's own testimony about his past unsavory behavior and Officer Lujan's testimony is that the latter was admitted because it was supposedly relevant to proving a conspiracy between Mr. Archuleta and his alleged accomplices. It represented the authoritative word of a law-enforcement officer, one who lived in the same community as the jurors and who was presented to them as a well-qualified expert in gang matters. Officer Lujan's testimony was calibrated to obtain a conviction, and that is precisely the problem. He did not know Mr. Archuleta, but he told the jury that he knew what a Sureño was like. And they were all pretty much the same, and they were all pretty evil. That, in a nutshell, was Officer Lujan's expert testimony. Its purpose seems largely to have been to instill fear and loathing in the jury. The risk that the testimony achieved that aim is far too great to countenance an affirmance of Mr. Archuleta's conviction in this case.[4]

---

insurmountable problem with Officer Lujan's testimony and, by extension, Mr. Archuleta's conviction on those counts. For the reasons explained in this dissent, Officer Lujan's testimony could not help but "affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Irving*, 665 F.3d 1184, 1213-14 (10th Cir. 2011) (alterations omitted) (internal quotation marks omitted). Because there is a serious possibility that the jury was impermissibly swayed in its deliberations surrounding the July 2 and 3, 2009 conspiracy counts, I believe reversal is required.

[4] I focus my dissent on the district court's abuse of discretion in admitting unfairly prejudicial testimony against Mr. Archuleta in violation of Rule 403. I agree with the majority that Mr. Archuleta failed to raise objections under Federal Rules of Evidence 702 and 704(b) at trial, thereby limiting us to plain-error review of those issues. Because I believe there are adequate grounds for reversal based on the violations of Rule 403 alone, I do not address the viability of Mr. Archuleta's arguments for reversal on Rule 702 and 704(b) grounds.

## Conclusion

In Mr. Archuleta's case, the government repeatedly chose to augment its evidence with additional layers of improper inference and innuendo. This was nothing but piling on. Our system of criminal justice deals with guilt, not guilt by association. When the government and its lawyers start going too far down that road, any reliable determination of actual guilt becomes unattainable for the individual criminal defendant. There is strong reason to believe the government went too far here.

Mr. Archuleta deserved a fair trial. He got something less than that. I respectfully dissent.